[No. A090567. First Dist., Div. Four. May 24, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID JOHN ECCLESTON, Defendant and Appellant.

## COUNSEL

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Eric D. Share, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAY, J.**—Evidence Code section 1360 establishes a procedure whereby evidence of a statement made by a victim under the age of 12 that would otherwise be treated as hearsay may be admitted in criminal prosecutions for specified sex offenses if (among other requirements) the trial court determines that "the time, content, and circumstances of the statement provide sufficient indicia of reliability." The issue presented here is whether evidence admitted in accordance with this statutory procedure violates the accused's rights to confront and cross-examine the witnesses against him. We hold that there is no constitutional violation.

### BACKGROUND

A jury found defendant David John Eccleston guilty of the felonies of oral copulation with a child under the age of 14 (Pen. Code, § 288a, subd. (c)(1)), lewd conduct with a child (Pen. Code, § 288, subd. (a)), and the misdemeanor of annoying a child (Pen. Code, § 647.6). The trial court found true an allegation that defendant had a Nevada conviction that would constitute lewd conduct with a child (Pen. Code, § 288, subd. (a)) if committed in this state and that qualified as a serious felony for purposes of the three strikes law and other recidivist statutes (Pen. Code, §§ 667.51, 667.61, 1170.12). The court sentenced defendant to an aggravated doubled term of 16 years for the oral copulation charge, a consecutive term of 25 years to life for the lewd conduct charge, and a 6-month concurrent term for the misdemeanor. Defendant filed a timely notice of appeal.

The only issue addressed here is the constitutionality of Evidence Code section 1360 (hereafter section 1360). Everything pertinent thereto is contained in the record of the pretrial proceedings concerning admission of the victim's statements as recounted by others.

Those proceedings were initiated by noticed motions from the prosecution "to admit prior statements of child victim" pursuant to section 1360 and to have child victim declared "unavailable as a witness" as defined by Evidence Code section 240. Defendant filed a brief in opposition to both motions, arguing that admission of "hearsay statements of a child declarant describing alleged acts of child abuse" would violate his constitutional right of confrontation. He argued that section 1360, "on its face, is at odds with the Confrontation Clause, as interpreted by our High Court" in *Idaho v. Wright* (1990) 497 U.S. 805 [110 S.Ct. 3139, 111 L.Ed.2d 638], and that the victim's statements "are not reliable, based upon analysis of relevant factors identified by the Supreme Court" in that decision.[1] The motions were the subject of an extensive evidentiary hearing.

The victim in this case came into defendant's life as an infant foster child being cared for by defendant's mother. The victim was three years old when she was adopted by defendant's mother. It appears that the events in question occurred and became known when the victim was eight years of age and defendant was 29.

Dr. Andrew Renouf, a psychologist with the Children, Youth and Family Services Division of the Humboldt County Department of Mental Health, examined the victim shortly after the improper sexual activities first came to light. Dr. Renouf reviewed the victim's medical and psychological history, personally interviewed the victim as well as defendant's mother, and then conducted various psychological tests. At the hearing, he testified at length concerning those tests and his reading of how they illuminated aspects of the victim's psyche and personality. Dr. Renouf concluded that it would be "extremely stressful" for the victim to testify at trial, "potentially very damaging" and might cause "a significant deterioration in her . . . ability to carry on the daily activities of normal life."

Psychologist Caroline Isaacs, who had been treating the victim for more than three years, was equally emphatic. She agreed with Dr. Renouf that the victim was "fragile." Ms. Isaacs believed that forcing the victim to testify at

[1]Defendant also objected on the ground that section 1360 violates due process by "isolat-[ing] a particular type of hearsay evidence that can only realistically be introduced against a defendant." Division Three of this court has rejected this objection to section 1360 (*People v. Brodit* (1998) 61 Cal.App.4th 1312 [72 Cal.Rptr.2d 154]) and defendant does not renew it on this appeal.

trial would "rip her apart." Both Isaacs and Renouf agreed that compelling the victim to attend the trial might trigger self-destructive impulses.

The trial court also heard testimony from Laura Todd, a member of the Child Abuse Services Team (CAST) that interviewed the victim less than three weeks after the first report of abuse was made. Ms. Todd described how the interview was conducted and that it commenced only after she was convinced the victim knew the difference between truth and falsehood. The interview was videotaped, and the tape was reviewed by the trial court prior to ruling on the prosecution's motion to admit evidence of statements made by the victim pursuant to section 1360.[2]

The interview occurred in a room with brightly colored furniture and decor obviously intended to put a child at ease. Inside the room were stuffed toys and other materials intended for the same purpose. The video is in color, its visual and audio qualities are excellent. The door to the outside, where the victim's mother waited, was closed. The victim knew the session was being recorded and that Ms. Todd was able to communicate to others outside the room.

The interview lasts approximately 43 minutes. The victim is immediately occupied with a large box of crayons and drawing paper. For the entire duration of the interview the victim was either drawing or playing with a Rubik's cube. More than 15 minutes go by before Ms. Todd starts moving the questioning in the direction of what defendant did. Ms. Todd's questioning is always low key, never insistent or inquisitorial. There are constant breaks where she and the victim discuss other things before Todd gently resumes her questions.

The victim told Todd that defendant would pull down her clothes, following which he "licked my feet and played with them." Defendant also "licked my private area," which felt "dumb." Although she initially denied that defendant had "done anything else that was bad," she admitted that at his direction she "touched his private." When Ms. Todd asked "can you show me with your hand how you touched his privates?" the victim made the unmistakable gesture of rubbing her cupped hand along the shaft of an erect penis; this was something else that defendant "had me do." Asked "did anything come out of it?" the victim replied "not pee, but . . . water stuff" that was white in color. Defendant also put his "private" in the victim's mouth several times; it made her gag and she did not like it, but "[h]e had

---

[2]The tape was later played for the jury at defendant's trial. The tape itself was not part of the original record on appeal. Recognizing its centrality to the trial court's ruling, we ordered the tape forwarded from the trial court. We have reviewed it and a transcript of the interview.

me do that." The victim had been reluctant to tell of these things because defendant told her "he might go to jail . . . or . . . that we might go to jail." Defendant told the victim that he kisses his girlfriends' bottoms. He showed her magazine pictures of "girls putting . . . their boyfriends penis in the mouth," which was what he told the victim "that's what I'm supposed to do." Defendant displayed his "balls" and put his finger in the victim's "private part."

Another CAST member, Christopher Andrews, testified that he spoke with defendant after the taped interview of the victim. Defendant made a number of admissions that tended to corroborate the victim's account. He acknowledged himself to be a "sex addict." He admitted that in 1992 he had digitally penetrated a seven-year-old girl in Humboldt County. Defendant also talked about his Nevada prior. When Andrews and a deputy sheriff found and seized a "magazine that related to women's feet," defendant told them he had a foot fetish.

The trial court granted the prosecution's motions to have the victim declared unavailable and to permit evidence of her statements pursuant to section 1360. Based upon the testimony of Dr. Renouf and Ms. Isaacs, the court found that the victim would suffer "substantial trauma" if made to testify and was therefore unavailable. With respect to the other motion, the court ruled as follows:

"I find the requirements of [section] 1360 for the admission of the child statement describing sex acts have been met. The child . . . is nine years old, so she falls within the provisions of the statute and notice has been given as required. [¶] As required by Section 1360, [I] did hold a hearing on the circumstances surrounding the statement to determine its reliability.

"In this regard, the Court viewed the CAST videotape . . . and took testimony from Laura Todd and Chris Andrews. My review of the videotape, as well as the testimony of Ms. Todd, supports my conclusion that the time, content and circumstances of the statement provides sufficient indication of its reliability to allow its admission. [¶] As counsel both presented to the Court, the test is the totality of the circumstances, and I do find that the totality of the circumstances surrounding the statement support its reliability.

"[The victim] showed that she could differentiate truth and falsehood; she showed she understood her surroundings; understood basic concepts; and showed sufficient level of understanding. The child's statements regarding the defendant's acts were spontaneous; that is, [the] . . . questions were open-ended. They were not leading questions. Very little prompting. The child volunteered information.

"I find the child has been consistent about what she has told others. While her statements may not have been as fully described previously, I didn't find they were inconsistent with previous disclosures to other people. [¶] She made statements to her teacher, Miss Davis. She has also spoken to the therapist about this.

"Let's see. The child, to the Court's satisfaction, described certain events clearly, was able to clearly state . . . what did occur, what did not occur. [¶] She showed personal knowledge for her statement. She also used language especially descriptive of certain events, such as semen, and other areas here that . . . would ordinarily not . . . be discussed by a child her age. [¶] There is no indication of any motive for the child to fabricate; to the contrary, she expressed her love and concern for the defendant . . . .

"Taking the statement, . . . you can see firsthand the circumstances surrounding the making of the statement, and also the fact that others witnessed the making of the statement. [¶] Again, considering the testimony and the tape itself, I find that the totality of the circumstances support its reliability.

"Because the child is unavailable under Evidence Code Section 240, there must be evidence corroborating her statement of abuse. That's a requirement of Evidence Code 1360. I find there is such evidence in this case.

"Chris Andrews testified that he interviewed the defendant after the child made the statement. The defendant admitted he was a sex addict, that . . . he had penetrated a seven-year-old child's vagina with his finger; that he had [a] prior conviction for sexually assaulting a four-year-old girl; that he had pornographic material that [the victim] may have seen. Also, that he had a foot fetish and [was] sexually attracted to female feet. [¶] . . . [T]here's also evidence that the defendant had access to [the victim], cared for [the victim] at times when others were not present within the room, and so forth.

"So for all of the above reasons and everything else that I read and saw here, I do find the statements to be sufficiently reliable to allow its admission . . . and that there's corroborating evidence.

"I did consider the child's mental state . . . but I did not find that that rendered the statement unreliable. All the other factors supported its admissibility. She was competent in terms of being able to communicate, express herself and show [*sic*?: know] the difference between truth and lie."

## REVIEW

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." (U.S. Const., 6th

Amend.) By virtue of the Fourteenth Amendment this right is made applicable to the states to the same extent as to the federal government. (E.g., *Pointer v. Texas* (1965) 380 U.S. 400, 403-408 [85 S.Ct. 1065, 1067-1070, 13 L.Ed.2d 923]; *Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1137-1138 [99 Cal.Rptr.2d 149, 5 P.3d 203].)[3] "[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the hearsay evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 66 [100 S.Ct. 2531, 2539, 65 L.Ed.2d 597]; accord, *Lee v. Illinois* (1986) 476 U.S. 530, 543 [106 S.Ct. 2056, 2063, 90 L.Ed.2d 514].)

For several decades the perception has been growing that the prevalence of sexual abuse of children has been outstripping society's ability to detect, prosecute, and punish. Beginning in 1982 in Washington, and following the recommendation of a report by the American Bar Association, a majority of states adopted statutes and rules of evidence allowing the introduction of hearsay statements by child abuse victims. (See ABA National Legal Resource Center for Child Advocacy and Protection, Recommendations for Improving Legal Intervention in Intrafamily Child Sexual Abuse Cases (1982) pp. 34-36; Note, *Should We Believe the People Who Believe the Children?: The Need for a New Sexual Abuse Tender Years Hearsay Exception Statute* (1995) 32 Harv. J. on Legis. 207, 237 & fn. 156; Note, *A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases* (1983) 83 Colum. L.Rev. 1745, 1763-1766.)

In 1990, the United States Supreme Court held that statements made to a physician by a child under the age of three had been erroneously admitted at trial because the prosecution had not satisfied the "particularized guarantees of trustworthiness" requirement of *Ohio v. Roberts*. The court identified a number of factors that were relevant to that requirement. It emphasized that there was no "mechanical test for determining 'particularized guarantees of trustworthiness'" and that "the unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." (*Idaho v. Wright, supra,* 497 U.S. 805, 821-822 [110 S.Ct. 3139, 3149-3150].)

---

[3]Defendant has never invoked the virtually identical provision of the California Constitution (Cal. Const., art. I, § 15).

Section 1360 was enacted five years later.[4] (Stats. 1995, ch. 87, § 3.)[5] It provides:

"(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply:

"(1) The statement is not otherwise admissible by statute or court rule.

"(2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.

"(3) The child either:

"(A) Testifies at the proceedings.

"(B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child.

---

[4]During this period various Courts of Appeal in this state were formulating what came to be known as the "child dependency hearsay exception," which permitted juvenile courts to admit evidence of out-of-court statements by alleged victims of sexual abuse. Our Supreme Court approved this exception in 1997. (*In re Cindy L.* (1997) 17 Cal.4th 15, 21-31 [69 Cal.Rptr.2d 803, 947 P.2d 1340] and decisions cited; see also *In re Lucero L.* (2000) 22 Cal.4th 1227, 1240-1249 [96 Cal.Rptr.2d 56, 998 P.2d 1019] [discussing partial codification of *Cindy L.* by Welf. & Inst. Code, § 355 and rejecting the claim that "the allowance of such hearsay without the opportunity for cross-examination is a violation of due process under the United States and California Constitutions."].)

[5]In *White v. Illinois* (1992) 502 U.S. 346 [112 S.Ct. 736, 116 L.Ed.2d 848], the United States Supreme Court held that statements made to a babysitter, parent, police officer, and emergency room personnel by a child who was unavailable for trial could be admitted under the spontaneous declaration and medical examination exceptions to the hearsay rule without violating the defendant's right of confrontation.

Certain legislative history material, which cite *White* but not *Wright*, indicate that section 1360 may have been intended in part to codify what the bill's author termed "the Medical Treatment and Diagnosis exception to hearsay" modeled on rule 803(4) of the Federal Rules of Evidence (28 U.S.C.); there are, however, also references to "the child abuse exception." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 355 (1995-1996 Reg. Sess.) as amended June 20, 1995, p. 3; Sen. Com. on Criminal Procedure, Analysis of Assem. Bill No. 355 (1995-1996 Reg. Sess.) as amended May 2, 1995, pp. 3-5.) For present purposes we note only that there is nothing in the language of section 1360 suggesting that its scope is restricted to statements made in the course of seeking medical attention.

"(b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement.

"(c) For purposes of this section, 'child abuse' means an act proscribed by Section 273a, 273d, or 288.5 of the Penal Code, or any of the acts described in Section 11165.1 of the Penal Code, and 'child neglect' means any of the acts described in Section 11165.2 of the Penal Code."

■ Section 1360 is too new to be considered a firmly rooted hearsay exception because it does not reflect "longstanding judicial and legislative experience in assessing the trustworthiness" of the statements it covers; the statute must therefore satisfy the "particularized guarantees of trustworthiness" standard under the confrontation clause. (See *Idaho v. Wright, supra*, 497 U.S. 805, 817 [110 S.Ct. 3139, 3147-3148].) The minimums of the standard were spelled out in *Wright*: While not formulating an exclusive list of factors that would be relevant to determining reliability, and leaving states "considerable leeway in the consideration of appropriate factors," the court did mention the following considerations that "properly relate to whether hearsay statements made by a child witness in child sexual abuse cases are reliable . . . [and] also apply to whether such statements bear 'particularized guarantees of trustworthiness' under the Confrontation Clause": (1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected from a child of that age; and (4) lack of a motive to fabricate. (*Id.* at pp. 821-822 [110 S.Ct. at pp. 3149-3150].) Section 1360, subdivision (a)(2) effectively incorporates that standard by requiring that the time, content and circumstances of the statement itself provide sufficient indicia of reliability. The statute goes on in subdivision (a)(3)(B) to provide that the child also be unavailable and that there be corroboration. There can be no constitutional objection to such additional requirements as section (a)(3)(B) may impose as a condition to the admission of such third party testimony, since the *Wright* standards of trustworthiness are independently required by subdivision (a)(2). Moreover, our Supreme Court has held that "the factors bearing on a statement's reliability are not limited to those specifically enumerated in . . . *Idaho v. Wright*—any factor bearing on reliability may be considered." (*In re Lucero L., supra*, 22 Cal.4th 1227, 1250.)

■ A trial court's findings concerning the indicia of reliability are subject to independent review on appeal. (*Lilly v. Virginia* (1999) 527 U.S.

116, 136 [119 S.Ct. 1887, 1899-1900, 144 L.Ed.2d 117].) ▮ One of the unenumerated factors that the trial court considered was whether the victim would be competent as a witness. This was an appropriate matter for the court to consider as germane to the issue of trustworthiness. (See *In re Cindy L., supra*, 17 Cal.4th 15, 30.) The trial court found that the victim "could differentiate truth and falsehood; . . . showed she understood her surroundings; understood basic concepts; and showed sufficient level of understanding." These findings clearly amount to a determination that the victim met the requirements for competency as a witness. (See Evid. Code, §§ 700-701; *People v. Cudjo* (1993) 6 Cal.4th 585, 621-622 [25 Cal.Rptr.2d 390, 863 P.2d 635].) These findings are supported by Ms. Todd's testimony and the interview tape, and our independent review leads us to the same conclusions. (*Lilly v. Virginia, supra*, at p. 136 [119 S.Ct. at pp. 1899-1900].)

Two of the factors enumerated in *Wright* were whether the statements were spontaneously made and consistently repeated. The evidence shows that the victim first reportedly approached her third grade schoolteacher, on March 9, 1999, and volunteered the statement that "my brother is doing something. It's something nasty that men do to women. It's our secret. If I told you, you might call the cops, and he told me not to tell . . . . [H]e sucks my toes and licks my feet." The following day, after being interviewed by a deputy sheriff, the victim came to the teacher and repeated that defendant "likes to . . . lick my feet and suck my fingers." This is spontaneity in the sense that the information of abuse was imparted at the victim's initiation. There was spontaneity in a second sense in that the subject of defendant's conduct arose during the CAST interview when Ms. Todd asked "So how come you're here to talk to me today?" and the victim replied "cause my . . . big brother did something bad to me." Later Ms. Todd asked "Tell me about what happened with you and your older brother," at which point the victim replied that "we both kissed a lot . . . he licked my feet and played with them . . . [a]nd, he licked my private area." The record also shows that, in addition to her teacher, the victim had spoken of defendant's conduct to a deputy sheriff and a child welfare services worker before speaking to Ms. Todd. Although the details of what the victim revealed during these conversations varied, the general outline of abuse—particularly defendant's attention to the victim's feet and "private area"—remained constant. There is therefore ample substantial evidence supporting the trial court's finding that "the child has been consistent about what she told others." We deem this a finding satisfying the "consistent repetition" factor enumerated in *Wright* (see 2 Myers, Evidence in Child Abuse and Neglect Cases (3d ed. 1997) § 7.51, pp. 335-338 [text & decisions cited in fns. 917-930]) and we agree with it on independent review. (*Lilly v. Virginia, supra*, 527 U.S. 116, 136 [119 S.Ct. 1887, 1899-1900].)

With respect to the factor of the victim's mental state, the record is mixed. The victim came into defendant's home as a foster child, and it is not surprising that she still suffers from the aftereffects of that instability. This was a large factor in Dr. Renouf and Ms. Isaacs concluding that it would be psychologically damaging for her to testify at a trial. On the other hand, the trial court did determine that the victim otherwise satisfied the requirements for being a witness. The tape shows that the victim is clearly capable of rational conversation. The tape and Ms. Todd's testimony show that the interview only proceeded once it was established that the victim knew the difference between truth and falsehood. The victim did not appear fearful because of her mother's absence, the presence of the video camera (which she thought was "Cool"), or the knowledge that other persons were likely hearing what she told Ms. Todd ("I won't worry about that"). The tape also shows that as the interview progressed and the subject of defendant's conduct was discussed, the victim became obviously uncomfortable and not anxious to continue, but at no point did the victim ask that the interview stop or refuse to respond to questions. Although sometimes puzzled and uneasy talking about what happened to her, the victim appears to have a clear understanding about the basic factual matters she was describing. Moreover, at one point she corrected Ms. Todd about what she (the victim) had previously said, and later fended off a question because "I'm not done coloring." This sort of comprehension and independence can be viewed as enhancing her reliability. (See 2 Myers, Evidence in Child Abuse and Neglect Cases, *supra*, § 7.51, p. 347.)

In terms of what the Supreme Court called "use of terminology unexpected of a child of similar age" (*Idaho v. Wright, supra*, 497 U.S. 805, 821 [110 S.Ct. 3139, 3149-3150]), the record does not permit an unhazarded answer. Whether "vagina," "penis," "balls," and "private part" are natural terminology of an eight-year-old girl is not an inquiry that can be satisfied from the evidence heard by the trial court. On the other hand, there is no doubt that the victim displayed a level of sexual knowledge that is far beyond what would be expected of a child of similar age. It cannot be the norm for eight-year-old girls to have firsthand experience of the varieties of sexual acts that she related. It must be unusual for such a child to be able to describe the emission of ejaculated semen. There is nothing in the record to suggest that the victim's level of knowledge came from a source other than personal experience. Dr. Renouf testified that the victim's responses to Rorschach tests revealed "[m]ore sexual content than I would expect" "very unusual for a child her age." As the trial court noted, and we agree, this advanced level of sexual knowledge points to trustworthiness. (See 2 Myers, Evidence in Child Abuse and Neglect Cases, *supra*, § 7.51, pp. 340-341 [text & decisions cited in fn. 940].)

Our independent review of the record further persuades us to concur with the trial court's finding that the victim had no motive to fabricate. Dr. Renouf testified that the results of another test led him to conclude that the victim "had difficulty making up stories." In light of the victim's expressed concern and affection for defendant there is obviously no factor of revenge or hostility in play. That the victim spoke knowing others were listening and that what she said was being taped are also pertinent to the issue of trustworthiness, as is the fact that the victim was not prompted by leading questions. (See 2 Myers, Evidence in Child Abuse and Neglect Cases, *supra*, § 7.51, pp. 330-332, 334-335 [text & decisions cited in fns. 899-901, 913].) "The environment was not shown to be threatening; instead, the evidence indicated that the statement took place in a special interview room designed to be comfortable and calming. No one except the victim and [Todd] was present, and no direct pressure on the victim from others was possible during that procedure." (*State v. Wright* (Mo. 1988) 751 S.W.2d 48, 52; see also *Gregg v. State* (1991) 201 Ga.App. 238 [411 S.E.2d 65, 68].) There is no evidence that Ms. Todd had any preconceived ideas of what happened or what she wanted the victim to say. (See *State v. Lanam* (Minn. 1990) 459 N.W.2d 656, 661.) Finally, the interview was not unduly prolonged.

These are the sort of factors which courts across the country have considered in determining whether their statutes and evidentiary rules similar to section 1360 satisfy *Wright* and confrontation. In upholding the constitutionality of section 1360, we join the clear majority of other states where no violation of confrontation rights have been found. (*Fortner v. State* (Ala.Crim.App. 1990) 582 So.2d 581; *People v. Diefenderfer* (Colo. 1989) 784 P.2d 741; *Thomas v. State* (Del. 1999) 725 A.2d 424; *Perez v. State* (Fla. 1988) 536 So.2d 206; *Reynolds v. State* (1988) 257 Ga. 725 [363 S.E.2d 249]; *People v. Bowen* (1998) 183 Ill.2d 103 [232 Ill.Dec. 800, 699 N.E.2d 577]; *Miller v. State* (Ind.Ct.App. 1986) 498 N.E.2d 1008; *State v. Myatt* (1985) 237 Kan. 17 [697 P.2d 836]; *State v. Bellotti* (Minn.Ct.App. 1986) 383 N.W.2d 308; *State v. Wright, supra,* 751 S.W.2d 48; *Bockting v. State* (1993) 109 Nev. 103 [ 847 P.2d 1364]; *State v. Storch* (1993) 66 Ohio St.3d 280 [612 N.E.2d 305]; *State v. Renly* (1992) 111 Or.App. 453 [827 P.2d 1345]; *Com. v. Hanawalt* ((1992) 419 Pa.Super. 411 [615 A.2d 432]; *State v. Buller* (S.D. 1992) 484 N.W.2d 883; *Buckley v. State* (Tex.Crim.App. 1990) 786 S.W.2d 357; *State v. Nelson* (Utah 1986) 725 P.2d 1353; *State v. Gallagher* (1988) 150 Vt. 341 [554 A.2d 221]; *State v. Ryan* (1984) 103 Wash.2d 165 [691 P.2d 197]; contra, *Vann v. State* (1992) 309 Ark. 303 [831 S.W.2d 126]; *Burke v. State* (Okla.Crim.App. 1991) 820 P.2d 1344; see also *Hall v. State* (Miss. 1989) 539 So.2d 1338 [statute similar to § 1360 held

invalid as infringing judicial rule power; confrontation issue not reached]; *State v. Zimmerman* (1992) 121 Idaho 971 [829 P.2d 861] [same]; *Drumm v. Com.* (Ky. 1990) 783 S.W.2d 380 [same]; *State v. Robinson* (1987) 153 Ariz. 191 [735 P.2d 801] [same, but statements held admissible pursuant to judicially promulgated rules of evidence].) Our independent review of the record has produced no basis for disputing the factual findings relevant to the constitutional issue of reliability carefully made by the trial court. (*Lilly v. Virginia, supra,* 527 U.S. 116, 136 [119 S.Ct. Ct. 1887, 1899-1900].)

An examination of section 1360 alongside *Idaho v. Wright* leads to the interesting conclusion that subdivision (a)(3) of the statute provides several safeguards that are not constitutionally required. Unless the child's statement is made within a judicial setting, there is no constitutional requirement that the child must be shown to be unavailable for the statement to be admitted at a subsequent trial. (*White v. Illinois, supra,* 502 U.S. 346, 353-355 [112 S.Ct. 736, 741-742]; *United States v. Inadi* (1986) 475 U.S. 387, 392-400 [106 S.Ct. 1121, 1124-1129, 89 L.Ed.2d 390].) Nevertheless, subdivision (a)(3) imposes such a requirement unless the child testifies. The trial court's finding that the victim was unavailable—which defendant does not challenge—is supported by substantial evidence in the form of the testimony of Dr. Renouf and Ms. Isaacs.

Section 1360, subdivision (a)(3)(B) also allows admission "only if there is evidence of the child abuse or neglect that corroborates the statement made by the child." The majority in *Wright* held that evidence corroborating the truth of the child's statement is not relevant in deciding whether the statement has the requisite "particularized guarantees of trustworthiness." (*Idaho v. Wright, supra,* 497 U.S. 805, 822-824 [110 S.Ct. 3139, 3150-3151];[6] accord, *Lilly v. Virginia, supra,* 527 U.S. 116, 137-138 [119 S.Ct. 1887, 1900-1901].) Our Supreme Court has repeatedly emphasized that "A requirement of corroboration is an additional safeguard against the possibility of fabrication by very young witnesses whose out-of-court statements are insulated from the rigors of cross-examination." (*In re Cindy L., supra,* 17 Cal.4th 15, 30; see also *id.* at p. 34; accord, *In re Lucero L., supra,* 22 Cal.4th 1227, 1246-1249.) This is not a constitutional mandate but a "prudential rule." (*In re Lucero L., supra,* at p. 1248.) The trial court's finding that there was corroboration of the victim's statement—which is also not challenged

---

[6]The four dissenters in *Wright* disagreed with the majority only on this point. (*Idaho v. Wright, supra,* 497 U.S. 805, 827-828 [110 S.Ct. 3139, 3152-3153] (dis. opn. of Kennedy, J.).)

by defendant—is more than amply supported by the testimony of Mr. Andrews.[7]

The judgment of conviction is affirmed.

Sepulveda, Acting P. J., and Chiantelli, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied August 22, 2001.

---

[7]Defendant also contends that Evidence Code section 1108 violates due process. He acknowledges that the California Supreme Court has rejected this argument in *People v. Falsetta* (1999) 21 Cal.4th 903 [89 Cal.Rptr.2d 847, 986 P.2d 182] and advises that his contention is made "to preserve the issue for possible federal review." Having no wish to impede his progress towards that objective, and no power to agree with his contention (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), we summarily reject it.

*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.