Filed 8/25/20  P. v. Rivera CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CARLOS A. RIVERA,<br><br>Defendant and Appellant. | B298187<br><br>Los Angeles County<br>Super. Ct. No. VA142780 |

APPEAL from a judgment of the Superior Court of Los Angeles County, John A. Torribio, Judge.  Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Carlos A. Rivera of two counts of oral copulation or sexual penetration of a child 10 years old or younger, and three counts of lewd acts upon a child under 14 years old. He appeals, and we affirm.

## BACKGROUND

An amended information charged Rivera with two counts of oral copulation or sexual penetration of Yvette M., a child under 10 years old, between May 31, 2014 and September 6, 2016, in violation of Penal Code section 288.7, subdivision (b) (counts 4 and 5). The information also charged that during the same time period Rivera committed two lewd acts against Yvette (counts 7 and 8), and between September 1, 2013 and September 6, 2016, he committed a lewd act against Melissa M. (count 6), in violation of Penal Code section 288, subdivision (a). The information alleged a multiple victim special circumstance under Penal Code section 667.61, subdivisions (b) and (e). (The court dismissed counts 1, 2, and 3 before trial.)

At the preliminary hearing, the court found then-four-year-old Yvette incompetent to testify. Two years later, at a hearing just before trial, the prosecutor sought to introduce the videotapes of forensic interviews of Yvette and Melissa conducted on September 6, 2016, over objections by the defense. The trial court watched the videotape of Yvette's interview and found it admissible. Defense counsel argued Yvette was required to testify if the videotape was admitted, and even then, the videotape was hearsay and playing it for the jury would violate Rivera's confrontation rights. (Melissa had testified at the preliminary hearing and the defense had an opportunity to cross-examine her.) The court asked Yvette whether she knew a truth from a lie. She answered yes, and said telling lies was

2

bad and got you in trouble.  The court found Yvette competent to testify, and admitted both videotapes.

Yvette, the prosecution's first witness, testified she was six years old and in first grade.  She promised to tell the truth.  She lived in an apartment but did not know the street or town, and Melissa was her older sister.  She used to live with her family in a front house, and she recognized Rivera as one of two men who lived in the back house.  Yvette went into the back house when she was little.  Asked what the man did inside the back house, she said she could not remember and it was a "bad question."  She did remember talking to a lady a long time ago about what happened at the back house, but then said she could not remember what she talked about, or whether anyone was with her when she talked to the lady.  She was smaller then.

The prosecutor asked to refresh Yvette's recollection, and the court excused the jury.  With everyone else out of the courtroom, the prosecutor showed Yvette the videotape of her interview.  The prosecutor then told the court Yvette said, "[T]hat was the truth and that she remembers.  She doesn't want to talk about it. . . .  And she's afraid she has done something bad. . . .  She remembered.  We went through [it].  It was a tickle in the butt and the chichi."

Yvette and Rivera returned to the courtroom.  The prosecutor asked Yvette if that was her in the videotape, and she said yes, "[a] long time ago."  Asked if she had talked about "el señor," Yvette said she was scared.  The court reminded Yvette this was a safe place and she should answer out loud "yes" or "no," but Yvette did not answer.  The trial court excused Yvette from the courtroom, stating she was "clearly reluctant and not willing to testify.  I don't want to turn it into coercion and maybe

3

exacerbate a situation that exists. . . .  I'm inclined to find that she's not available."

The court and counsel discussed whether Yvette was unavailable to testify, and whether allowing her videotaped interview into evidence violated Rivera's confrontation rights and met the requirements of Evidence Code section 1360.[1] The prosecutor pointed out that Rivera admitted his conduct toward Yvette, and Melissa and Melanie (the girls' cousin) would testify they saw him touch Yvette's chest.  The court concluded the videotaped interview was sufficiently corroborated to make Yvette's statements admissible, given that she was "available but not available" as a witness.  Defense counsel renewed her objection that she never had the opportunity to cross-examine Yvette:  "She was found incompetent at the preliminary hearing.  She is found unavailable today.  And I believe that allowing her . . . videotaped interview that was several years ago violates my client's right to cross-examine his accuser."  The court admitted the videotaped interview.

The jury returned to the courtroom.  Nine-year-old Melissa testified she and her family used to live in a front house in Norwalk, and Rivera (whom she called "el señor") and another man lived in the back house.  Melissa had told her cousin Melanie what happened in the back house with Rivera.  Then she had to tell the police and a lady who used teddy bears so Melissa could show her what had happened.  Yvette was in the back house too, playing around and listening to music, when Rivera "touched us from the sides."  She saw Rivera touch Yvette the same way he touched her.

---

[1]     All subsequent statutory references are to the Evidence Code.

4

After Melissa said it would help her remember, she watched the videotape of her interview outside the jury's presence. Melissa then testified Rivera touched her on her chest and her privates, and she saw Rivera touch Yvette in the same places, through her clothes. On cross-examination, Melissa testified this happened on Labor Day, when she and Yvette were sitting next to each other inside the back house with Rivera. She told Melanie about it when Melanie was at her house for a party. Melanie told Melissa's grandmother, and her grandmother called the cops.

Nine-year-old Melanie testified Melissa and Yvette were her cousins. She had talked about a "bad thing" with Melissa, and saw a "bad thing" happen to Yvette. Melissa told Melanie that Rivera touched Melissa and Yvette. Melanie saw Rivera touch Yvette's breasts. Melanie did not see him touch Melissa, but from the way Melissa described it, Melanie knew "it was a bad touch." "After she told me, I went to go tell my mom and everybody that was in the front house," including Melissa's mother.

On cross-examination, Melanie testified she was outside the back house when she saw Rivera touch Yvette, who was standing inside the back house. She told Yvette to go to the front house, and the two of them went together. Melanie told Yvette's father what she saw and what Melissa had told her earlier that day. Melissa's mother and grandmother were in the next room.

Sheriff's Deputy Jason Marx, the investigating officer, took the children to be interviewed at the Child Abuse Service Team center the next day, September 6, 2016. He listened and watched through a two-way mirror. The prosecutor played the videotapes of the interviews for the jury.

Melissa, then in first grade, told the interviewer she and Yvette went into the back house when only Rivera was there, and he closed the door. Rivera was dancing, and he picked them up, put them on the couch, and rubbed their breasts and between their legs, first Melissa and then Yvette. It tickled and he was laughing.

Yvette told the interviewer she was four years old. "El señor" lived in the back house and had tickled her all over. When she was alone with him inside the back house, he put his hand inside her underwear, inserted his finger in her vagina, and moved it around, with his hand in his pants. He also put his finger in her anus, which hurt. Rivera tickled her breasts inside her clothes, and he kissed her on the mouth.

Yvette said Rivera also touched her when Melissa was there. When she was in Rivera's bed with him, he took her clothes off and kissed her mouth and her butt, and tickled her butt. Then he kissed her "pee-pee" with his mouth. Rivera told her not to tell anyone, and he gave her a bracelet.

Martin M., Yvette and Melissa's father, testified that on September 5 he heard Melissa telling her cousin Melanie that Rivera touched them on the breasts and "down there." Shocked, he started to ask Melissa questions. After she told him what happened, he took Melissa and Melanie inside the front house and told his wife.

Blanca M., the girls' grandmother, testified she arrived later and tried to talk to Melissa about the "problem." Melissa screamed and yelled that she did not want to talk about anything, and started throwing "everything that was in her sight." Yvette asked Blanca if she knew why Melissa was crying, and she told Yvette Melissa was crying because Rivera touched

her.  Blanca told Yvette to look her straight in the eye and tell her the truth, and asked if Rivera had touched her.  Yvette answered yes.

Deputy Marx interviewed Rivera on September 7.  An audiotape was played for the jury.  Rivera said he was 55 years old.  The two girls who lived in the front house would visit the back house to see him and his roommate and ask for food.  About five months earlier he played with them both by throwing them on the couch.

About two weeks ago, the littlest girl came over by herself.  Rivera admitted kissing Yvette on the mouth, pulling her panties down, and kissing her vagina.  He also rubbed her vagina several times over her underwear.  He denied he ever penetrated her.  He knew it was wrong; it was just curiosity, and he thought she wouldn't say anything.  He was "mentally excited" when he did it.  He denied he ever touched Melissa.

Dr. Bradley D. McAuliffe testified for the defense as an expert on forensic interviewing and the suggestibility of children.  He had reviewed the interviews of the children and Rivera, the police reports, and the preliminary hearing testimony, but he did not interview anyone in the case.  The accuracy of a child witness's statements could be affected by conformity, pressure from family members, and overhearing other information.  Although the child was not trying to lie or deceive, his or her memory had been compromised.  Leading interview questions from an authority figure also could influence a child's testimony, especially a preschooler.  Cross-contamination could occur when other information in the child's environment became encoded in the child's memory as if it were part of the actual event.  In this case, he was concerned that other family members had been

7

interviewed inside the front house with the girls nearby, and the girls had been questioned by a lot of family members and police officers. He also had concerns about Yvette's cognitive ability, including whether she could tell the truth from a lie.

The jury found Rivera guilty on all five counts. The trial court sentenced him to a total term of 30 years to life, with custody credit, and imposed restitution, fines, and fees.

## DISCUSSION

1. ***The court did not abuse its discretion when it found Yvette unavailable as a witness under section 1360***

Rivera argues the court abused its discretion when it found Yvette unavailable as a witness and allowed the jury to watch the videotape of her interview.

Because Yvette did not testify at trial, and her interview was offered to prove the truth of the matter stated, her statements in the interview were hearsay. (§ 1200.) " '[S]ection 1360 creates a limited exception to the hearsay rule in criminal prosecutions for a child's statements describing acts of child abuse or neglect, including statements describing sexual abuse. [Citations.]' [Citation.] The statute includes a number of procedural and substantive safeguards designed to ensure the reliability of the minor victim's hearsay statement, requiring specific conditions be met before evidence can be admitted under its provisions." (*People v. Mitchell* (2020) 46 Cal.App.5th 919, 927.) We review the trial court's decision to admit evidence under section 1360 for a clear abuse of discretion. (*People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 959.)

In a criminal prosecution with a minor victim, a statement the victim made while under the age of 12 describing any act of child abuse on the victim is not inadmissible as hearsay if

8

the court finds (in a hearing outside the presence of the jury) that the time, content, and circumstances of the statement show the statement is reliable.  (§ 1360, subd. (a)(2).)  If the child does not testify at trial, the child must be "unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child."  (§ 1360, subd. (a)(3)(B).)  A witness is unavailable if the witness is "[d]isqualified from testifying to the matter."  (§ 240, subd. (a)(2).)  "A person is disqualified to be a witness if he or she is:  (1) Incapable of expressing himself or herself concerning the matter so as to be understood . . . ; or (2) Incapable of understanding the duty of a witness to tell the truth."  (§ 701, subd. (a).)  "The party challenging a witness's competency has the burden to prove incompetency by a preponderance of the evidence."  (*People v. Giron-Chamul*, *supra*, 245 Cal.App.4th at p. 959.)

Rivera argues the trial court's questioning and Yvette's response did not show she was incapable of either expressing herself or understanding her duty as a witness to tell the truth, and so the court abused its discretion when it found Yvette was unable to qualify as a witness and therefore was unavailable.

"In general, every person, irrespective of age, is qualified to be a witness."  (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1368.)  Yvette's age alone (six at the time of trial) did not disqualify her from being a witness.  (*Id.* at pp. 1368-1369.)

The court did not abuse its discretion in finding Yvette unavailable to testify.  Once on the stand, Yvette said she did not remember anything she did in the back house, and the prosecutor's question whether she remembered what Rivera did there was a "bad question."  Asked if she had talked to a lady

9

about what happened, she said yes, but she did not remember what she talked about or whether she was alone. After the prosecutor showed Yvette the videotape to refresh her memory, she told the prosecutor she didn't want to talk about it and was afraid she did something bad. Back before the judge, with Rivera present, she confirmed she was shown on the videotape, but would not answer the prosecutor's questions whether she talked about Rivera in the videotape. She would not answer whether she remembered, or whether she didn't want to talk about it. She said she was scared. She refused to answer "yes" or "no" to whether she told the interviewer about Rivera. She was not, as Rivera claims, "somewhat 'reluctant'" to testify. This was not reluctance, but a flat refusal to testify by a frightened six-year-old girl after she viewed the videotape of the interview when she was only four, describing the sexual abuse she had suffered days earlier. The trial court was able to assess Yvette's demeanor on the stand. The court did not abuse its discretion in deciding she was incapable of expressing herself about Rivera's sexual abuse, and therefore was unavailable as a witness.

The court also fulfilled its obligation under section 1360, subdivision (a)(3)(B) by finding that other evidence of Rivera's sexual abuse corroborated Yvette's statements. Melissa testified she saw Rivera touch Yvette's chest and "private[s]" through her clothes. Melanie testified she saw Rivera touch Yvette's breasts. And Rivera himself admitted he kissed Yvette on her vagina and rubbed her vagina over her underwear several times. The videotape of Yvette's interview was properly admitted into evidence.

10

## 2. *Yvette's hearsay statements had adequate indicia of reliability under the Confrontation Clause*

Rivera argues the admission of the videotaped interview violated his right to confront Yvette. For hearsay to be admitted without violating the Confrontation Clause of the Sixth Amendment, the prosecution must show the statement has adequate indicia of reliability, which we infer if the evidence is admitted under a " 'firmly rooted' " hearsay exception. (*People v. Eccleston* (2001) 89 Cal.App.4th 436, 443 (*Eccleston*).) Section 1360 is not a firmly rooted hearsay exception. (*Eccleston*, at p. 445.) The statute does, however, include in subdivision (a)(3)(B) a corroboration requirement, which is not constitutionally required but serves as " 'an additional safeguard against the possibility of fabrication by very young witnesses whose out-of-court statements are insulated from the rigors of cross-examination.' " (*Eccleston*, at pp. 449-450.)

We have already determined the trial court did not abuse its discretion in finding Yvette unavailable to testify. Whether Yvette's hearsay statements in her interview had adequate indicia of reliability for Confrontation Clause purposes is a separate question which we review independently. (*Eccleston*, *supra*, 89 Cal.App.4th at p. 445.)

Section 1360, subdivision (a)(2) requires the trial court to find at the hearing "the time, content, and circumstances of the statement provide sufficient indicia of reliability." The minimum standards for determining reliability for Confrontation Clause analysis include "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected from a child of that age; and (4) lack of a motive to fabricate." (*Eccleston*, *supra*, 89 Cal.App.4th at p. 445.) We also may

11

consider any other factor bearing on reliability. (*Ibid.*) The courts have considerable leeway in their consideration of appropriate factors, and the " 'unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made.' [Citation.]" (*People v. Roberto V.*, *supra*, 93 Cal.App.4th at p. 1374.) We do not consider corroborating evidence introduced at trial. (*Ibid.*)

Yvette's interview statements meet these requirements for reliability. She was interviewed by a trained interviewer shortly after the alleged abuse, with no family members present. Yvette spontaneously and repeatedly stated Rivera touched her breasts, vagina, and anus, kissed her vagina and anus, and inserted his finger in her vagina and anus. Rivera does not question Yvette's mental state. She used appropriately childish words to describe where and how Rivera abused her, describing sexual acts far beyond the usual knowledge of a four-year-old. Yvette did not say she disliked Rivera and nothing in the interview suggests she had a motive to fabricate the sexual abuse she described.

Rivera claims as confrontation clause error the lack of express findings on the reliability of Yvette's hearsay statements. But nothing required the trial court to make an express finding of reliability. The court was aware of and correctly applied section 1360, the applicable law, and we will presume the trial court had a proper basis to find Yvette's statements reliable under the statute. The court heard and rejected defense counsel's argument that the interview violated Rivera's right to confront and cross-examine Yvette. Generally, unless the legislature mandates that a trial court express its findings on the record, we will infer that the court made all the findings necessary

12

to support its ruling.  (§ 402, subd. (c); *People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)

Rivera argues Yvette's hearsay statements in the interview were unreliable and "suspect," given the testimony of his expert witness about suggestibility and cross-contamination.  But expert testimony at trial is not relevant to the trial court's pretrial assessment of reliability when it decided to admit the hearsay statements.  The jury was entitled to consider and reject the expert testimony challenging the credibility of Yvette's and Melissa's descriptions of Rivera's abuse.

Our independent review of Yvette's interview shows adequate indicia of reliability.  The record supports the trial court's implied findings of reliability in support of its decision to admit the interview.  No violation of Rivera's confrontation rights occurred.

### 3.    *Rivera forfeited his challenge to the testimony of Yvette's grandmother*

Rivera raises similar hearsay and confrontation clause challenges to Yvette's grandmother's testimony that Yvette answered yes when asked if Rivera had touched her.  Defense counsel did not object to the testimony at trial, and the trial court's ruling addressed only the videotape of Yvette's interview.

"[N]umerous decisions by this court have established the general rule that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal."  (*People v. Dykes* (2009) 46 Cal.4th 731, 756.)  Rivera also "did not raise an objection below based upon the confrontation clause, and therefore has forfeited this claim."  (*People v. Redd* (2010) 48 Cal.4th 691, 730.)

13

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.

DHANIDINA, J.