Filed 2/27/13  P. v. Santiagovictoria CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037766 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CC955334) |
| v. | |
| ZOSIMO JULIAN SANTIAGOVICTORIA, | |
| Defendant and Appellant. | |

A jury convicted defendant Zosimo Julian Santiagovictoria of four felony counts related to the sexual molestation of his five-year-old niece (M.).  Defendant argues on appeal that he was denied due process of law because the trial judge did not recuse herself from ruling upon M.'s competence to testify at trial after having ruled upon the same issue at the preliminary hearing 18 months earlier.  He also argues, on both constitutional and statutory grounds, that the trial court erred in admitting into evidence M.'s preliminary hearing testimony and her pretrial interview with law enforcement.  Finding no error, we shall affirm.

### I.    PROCEDURAL BACKGROUND

A second amended information charged defendant with two counts of sexual penetration of a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b), counts 1 & 2) and two counts of lewd conduct upon a child (*id*. § 288, subd. (a), counts 3 & 4).  The crimes were alleged to have occurred "between January 1, 2008 and September 11, 2009" when M. was four and five years old.  The jury found defendant guilty as charged

on counts 1, 3, and 4. On count 2, the jury found defendant guilty of the lesser included offense of attempted sexual penetration.

The trial court sentenced defendant on count 1 to 15 years to life in prison. The court added three consecutive determinate terms: seven years for the lesser included offense on count 2, and two years each (one-third the middle term) for counts 3 and 4, for a total of 26 years to life in prison.

## II. THE PRELIMINARY HEARING

### A. M.'s Testimony at the Preliminary Hearing

The preliminary hearing was held March 24, 2010. At the commencement of the hearing the court assessed M.'s truth competence. M. was a kindergartener at the time. She had just turned six in January. M. incorrectly stated that she was five years old but when reminded that she had had a birthday in January she agreed that she was six. When asked if she would prefer to have questions and answers in Spanish or English she said she would prefer Spanish but proceeded to answer in English. She did not know why she was in court that day. She said she was not frightened.

The court asked M. if it is bad to tell a lie and M. answered "No." She was able to distinguish truthful statements from false ones as when she was asked whether a red pen was a green teddy bear. She agreed that in answering questions she would only tell "what really happened." The court found M. competent to testify. In follow-up questioning by counsel M. answered "Yeah" when asked if it was bad to tell a lie and agreed that if she did not tell the truth she would "get in trouble."

When asked if defendant had done anything to her that she did not like M. pointed between her legs and said that defendant had touched her there. When asked how many times he had done that, M. replied, "Every day." Counsel asked M. to estimate how many times defendant had touched her. M. said it was "[m]ore than a hundred times." He always touched with his finger and never touched any part of her body other than the place she had just pointed to, the place "[w]here you make peep." She said that he had

2

touched her skin, not over her clothes, and it sometimes hurt and sometimes tickled. The touching always took place at the home. He used his middle finger and put it "a little bit" inside.

M. was inconsistent in her answers to questions about when the touching occurred. She stated that all the touches occurred "last year," which would have been 2009. She also said the touching began when defendant moved in with the family in 2008, when M. was four years old, and also that she did not remember when it began.

The last time defendant touched M. in a way she did not like, M.'s mother had come in from the kitchen and "saw it." The touch happened in the living room. M. was jumping on defendant's bed, which was in the living room. Defendant was sitting on the bed. M. was wearing underwear. When she sat down, defendant touched her over her underwear. When her mom walked in defendant stopped. This was the last time he touched her. M.'s mother took M. into her bedroom and asked her what defendant had been doing. She told M. to tell the truth.

### B. Officer Ichige's Interview of M.

On September 11, 2009, two days after the last touching, M.'s mother took her to the hospital where M. underwent an examination to determine whether she had been sexually assaulted. Although the examination did not reveal anal or genital trauma, hospital personnel called the police. M. spoke with a police officer at the hospital. San Jose Police Officer Daniel Ichige conducted a follow-up investigation.

Ichige's interview of M. was conducted in Spanish and was videotaped. Ichige recalled that when he tested M.'s competence M. made some errors in distinguishing a true statement from a false statement. The videotape of Ichige's interview with M. was entered into evidence. In it M. explained that defendant had touched her "where you go peepee." She denied that he had ever touched her on her "butt." He once touched her when she was in the living room with him and her mother was cooking in the kitchen. Her mother "saw it." Ichige asked M. how many times "in total" defendant had touched

3

her in the way she described and M. said that he did it when her mother was "t[h]rowing the trash out," and "when she is talking with my aunt [inaudible] and when she, um, she is taking a bath." It was "a few times" and "When she comes out, he stops." She also said that he touched her there "every day" when she is in the house with him. He touched her over her clothes and inside the clothes touching her skin.

### C. Officer Ichige's Interview of Defendant

In interviewing defendant, Ichige employed a ruse, telling defendant that M. was at the hospital and they were collecting evidence that would prove defendant had molested her. Defendant denied having touched M. inappropriately on the day the mother came out of the kitchen. He said that M. had been on the couch with him and he was hugging her and combing her hair. He subsequently admitted that a day earlier, M. was naked because she was about to bathe. She had jumped on defendant and he accidently touched her vagina. Ichige placed his hands together to make what he intended to look like a model of the female clitoris and vaginal opening but which could also look like the labia. Defendant used his two fingers with a swiping motion to demonstrate how he had touched M. He insisted that his fingers had not gone inside, "Not inside the lips . . . ." He also said that he should not have touched M. and insisted that it was only the one time that he did.

### III. THE TRIAL

#### A. In Limine Motions

At the outset of trial defendant asked the trial judge to recuse herself from assessing M.'s competence to testify at trial, noting that the judge had ruled upon the child's competence prior to her testimony at the preliminary hearing. After the court denied the request, defendant asked the court to hold an Evidence Code section 402 hearing to assess M.'s competence as a witness. M. was by then seven years old and in the second grade. The court questioned M. to assess her ability to distinguish a true statement from a false one. M. correctly identified four stuffed animals by color and

4

mode of dress and correctly distinguished false statements about the toys from true ones. The child responded affirmatively when asked if it is bad to tell a lie and agreed that if she told a lie she would get in trouble. The trial court then found her to be competent.

The court next considered the prosecution's request to admit M.'s prior statements into evidence under Evidence Code section 1360, which provides an exception to the hearsay rule for extrajudicial statements by child abuse victims. Over defendant's objections, the trial court admitted the preliminary hearing transcript of M.'s testimony and the videotape of M.'s interview with Ichige and ordered that the jury be given a transcript of the latter with the original Spanish and the English translation. The court admitted both statements in their entirety.

## B. The Prosecution's Case

M. was the first witness for the prosecution. M. testified that she lived in a home with her mother and father, an aunt and uncle, defendant, who was also her uncle, and defendant's daughter. M. identified defendant in court and stated that "[h]e touched me somewhere where he's not supposed to touch." That place was "where I do pee." M. stood up and pointed to her crotch area. She then described four occasions when defendant had touched her.

The first occasion she described occurred when M. was sitting on the sofa wearing a party dress and watching television. Defendant was on his bed behind the sofa in the living room. M.'s mother was in the kitchen; her father, her other uncle, and her cousin were at work. Her aunt was in her own room. Defendant came to the sofa and sat down next to M. and touched her. M. demonstrated with her left hand, making a downward motion toward her crotch. The touch, she said, was to her skin, not over her clothes. She said it felt "bad." "Because he touched it a little somewhere where there's a red center." She confirmed that the red center was on her "peepee." She agreed that his hand went "inside" her peepee, that it moved, and that it hurt. He kept his hand there for "a second."

5

She felt afraid but could not answer when asked why she was afraid.  She told him not to do it anymore.  He then went back to his bed and M. went to her room.

Another time M.'s mother had taken the garbage out.  M. was on the couch in the living room playing with her dolls.  She was wearing a shirt and a pair of shorts.  Defendant was on the other couch.  M.'s father and her other uncle were at work.  Her aunt was in her room.  M. did not know where her cousin was.  While M. was playing with her dolls, defendant moved to the couch where M. was sitting.  Before he did anything M. told him not to do it anymore but he went ahead and touched her the same way he had previously.  M. could not recall how his hand went in but the touch was on her skin and it felt bad, "[b]ecause he touched me in the same place."  Again, the hand was moving and it felt like a pinch.  When asked if she felt it "in the red spot inside" or "kind of on the outside" M. answered:  "kind of on the outside."  He kept his hand there for "two seconds."  Again she told him not to do it anymore.  By the time her mother returned from taking the garbage out, defendant was back on the other sofa.

Another touching occurred at a time when M. "came down from [her] bed."  She had just taken a nap and was wearing shorts and a t-shirt.  She walked into the living room where she saw defendant on his bed.  Her mother was in the kitchen.  Her father was at work.  Her aunt and uncle were in their room.  She did not know where her cousin was.  First M. sat on the floor to play with her dolls.  Then she moved to the sofa.  Defendant came over to the sofa and touched her in the "same place."  He touched her skin, "kind of on the outside."  He left his hand there for "a second."  The hand moved "a little."  M. felt it tickle.

The final touching M. described happened when M. had been on defendant's bed watching television from there.  Defendant sat close to her and touched her on her skin.  She felt it "on the outside" like he was tickling her.  He removed his hand when M.'s mother came in.  M.'s mother took her aside and asked her what happened.  M. was afraid to tell her father because she thought he would get mad.  She did tell her mother

6

what happened and when her mother told her father her father did get a little mad at defendant but not at M. Two days after the last touching, M. went to see a doctor who "looked for evidence." Afterward, she talked to the police officers.

M. did not recall defendant having touched any part of her other than the area she referred to as her peepee. She did not hear him breathing hard and he never showed her his genitals. M. denied that defendant ever brushed her hair.

David Kerns, M.D., reviewed the reports and photographs detailing M.'s physical examination and opined that there was no evidence of anal or genital trauma and that the lack of such evidence did not rule out the possibility of a prior penetrating event or sexual assault that did not result in physical injury.

The prosecution then introduced the transcript of M.'s testimony at the preliminary hearing and her interview with Officer Ichige.

### C. *The Defense Case*

Defendant did not introduce any witnesses. He relied upon cross-examination of the prosecution witnesses and argued that the prosecution had not proved his guilt beyond a reasonable doubt.

### IV. DISCUSSION

### A. *The Failure to Recuse*

The trial court found M. competent to testify at trial. Defendant does not challenge the finding itself. Defendant argues, however, that since the same judge had ruled upon M.'s competence at the preliminary hearing, the court had literally prejudged the issue of her competence. Citing *Caperton v. A.T. Massey Coal Co.* (2009) 556 U.S. 868, 884 (*Caperton*), defendant maintains that the trial judge's failure to recuse herself from making the second competency determination deprived defendant of his constitutional right to due process. (U.S. Const., 14th Amend.) Because the argument implicates defendant's constitutional rights, we shall apply the independent standard of review. (*People v. Cromer* (2001) 24 Cal.4th 889, 901-902.)

7

*Caperton* was the case in which a West Virginia state Supreme Court justice had denied a recusal motion in a matter in which an executive of one of the parties had contributed $3 million to the justice's campaign for election to the bench. (*Caperton*, *supra*, 556 U.S. at p. 873.) *Caperton* traced the development of the law pertaining to judicial recusal motions. Under the common law, a judge was bound to grant such a motion only where the judge had a " 'direct, personal, substantial, pecuniary interest' " in the matter being adjudicated. (*Id.* at p. 876 quoting *Tumey v. Ohio* (1927) 273 U.S. 510, 523 (*Tumey*).) *Tumey* extended the rule to situations where there are "interests that tempt adjudicators to disregard neutrality." (*Caperton*, *supra*, at p. 878.) In *Tumey*, for example, the suspect interest was the fact that the judge was paid for his work with fines collected from the accused. If the accused was acquitted, there were no fines. (*Tumey*, *supra*, at p. 520.) Those judges were required to recuse themselves. (*Id.* at p. 532.)

Another situation requiring recusal is where the judge has a conflict arising from participation in an earlier proceeding. This rule was enunciated in *In re Murchison* (1955) 349 U.S. 133 (*Murchison*). In *Murchison*, a judge conducted the preliminary hearing in secret, as provided by state law. During the course of those proceedings, the judge disbelieved one witness and charged him with perjury. A second witness refused to testify until his attorney arrived and so the judge found him in contempt. Thereafter, the same judge tried the two on the perjury and contempt charges and convicted both of them. (*Id.* at pp. 134-135.) *Murchison* held that, given the nature of the prior proceedings, the judge could not have been "wholly disinterested" in conviction or acquittal. (*Id.* at p. 137.)

In distilling the rules to take from the foregoing cases, *Caperton*, *supra*, 556 U.S. at page 883, noted that the "difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules." Accordingly, the due process clause is implemented by objective standards. Although the standard cannot be defined with precision, typically, the court asks whether, " 'under a

8

realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.' " (*Id.* at pp. 883-884, quoting *Withrow v. Larkin* (1975) 421 U.S. 35, 47.) Our own Supreme Court summarized *Caperton*, explaining that, although the circumstances warranting disqualification extend beyond the common law rule of direct personal pecuniary interest, such circumstances are, nevertheless limited to the most extreme cases. (*People v. Freeman* (2010) 47 Cal.4th 993, 1005.)

Pointing to *Murchison*, *supra*, 349 U.S. 133, defendant argues that, since the trial judge had already found M. to be competent to testify at the preliminary hearing, the judge had actually prejudged the issue when it came time for trial and, therefore, could not be wholly disinterested in the results the second time. We reject the argument because this is not the kind of extreme case that requires recusal. This case is nothing like *Murchison*, where the court acted as both the charging party and the finder of fact. Here, the court was called upon to make a routine determination based upon the facts elicited and the court's observations at the time. There is nothing in the record to suggest that the court had such an interest in the rightness of the first ruling that it would pose a risk of actual bias at the time the court was asked to rule a second time. Indeed, as the Attorney General argues, the trial court actually made two different rulings based upon two different sets of facts. The first ruling was that M., who had just turned six years old, was competent to testify at the preliminary hearing. The second ruling came one and one-half years later and involved the question whether the child was *then* competent to testify. Although the rulings involved the same witness, the witness was a child who, at the time of the second ruling, was one and one-half years older and two grade levels further along in school than she was the first time. The court did no rely upon its prior finding. Rather, the court conducted an extended voir dire, collecting new data pertaining to M.'s ability to understand her duty to tell the truth. The court based its second ruling

upon the new data. There was no prejudging and no hint of actual bias. There was no due process violation.

### B.    M.'s Prior Statements

The trial court granted the prosecutor's motion under Evidence Code section 1360 to admit the video recording of M.'s interview with Officer Ichige and a transcript of her testimony at the preliminary hearing. Evidence Code section 1360 creates an exception to the hearsay rule for extrajudicial statements by young children who have been victims of abuse or neglect. Such statements are admissible if, among other things, the trial court finds "that the time, content, and circumstances of the statement provide sufficient indicia of reliability." (Evid. Code, § 1360, subd. (a)(2).)[1]

In the present case, the trial court found the indicia of reliability were sufficient to meet the statutory requirements. The court observed that the interview with Ichige had taken place in a room especially designed for child interviews and that the officer established M.'s competence before proceeding with the interview. "Although there was clearly some problems at times, and I am sure that's something that the jury may take into consideration."

As to all three prior statements, the trial court found that M. "really wasn't led. [¶] She was asked what happened. [¶] I think that the patrol officer got--did have information

---

[1] Evidence Code section 1360 states, in pertinent part: "(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child either: [¶] (A) Testifies at the proceedings. [¶] (B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child."

that she had been touched. And so he said, where did he touch you? And she immediately pointed to her genital area. And she has been consistent all along that he was using one finger. She showed the finger. [¶] She showed where the touching was going on. [¶] And we all know that in cases where there are prior statements there are going to be inconsistencies, and consistencies. And it is something that is very important to the jury in determining the credibility of the witness. [¶] I think that these statements are important to the credibility, determining the credibility of [M.]. [¶] I think they comply with the requirements of [Evidence Code section] 1360 . . . .”

Defendant contends that the statements’ indicia of reliability were not sufficient to warrant admission of the statements into evidence. To the extent the alleged error is statutory, it is subject to review for abuse of discretion. (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367.) Defendant maintains, however, that his argument reaches beyond the statutory requirements. He argues that the due process guarantees of the Fifth and Fourteenth Amendments bar the admissibility of unreliable evidence (see *Michigan v. Bryant* (2011)__ U.S. __ [2011 U.S. LEXIS 1713] [131 S.Ct. 1143, 1162, fn. 13]) so that the trial court’s assessment of the statements’ reliability, a mixed question of fact and law, implicates his constitutional rights. Again, we review such decisions under the independent standard of review. (*People v. Cromer*, *supra*, 24 Cal.4th at pp. 901-902.) Applying our independent review, we conclude that defendant was afforded all the process he was due.

The question is whether there were “sufficient indicia” that the statements may be relied upon for their truth. Our courts have imported a test for reliability from *Idaho v. Wright* (1990) 497 U.S. 805 (*Wright*), in which the United States Supreme Court discussed the constitutionality of a statutory hearsay exception to statements of a nontestifying child victim of sexual abuse. *Wright* found that admission of a child’s out-of-court statements did not offend the Confrontation Clause of the Sixth Amendment so long as those statements bore “ ‘particularized guarantees of trustworthiness.’ ” (*Id.* at p.

11

816.) *Wright* was decided in the era when reliability was the touchstone of admissibility in Confrontation Clause cases. (*Id.* at pp. 814-816; see *Ohio v. Roberts* (1980) 448 U.S. 56, 65-66.) *Crawford v. Washington* (2004) 541 U.S. 36, 60-61, overruled the reliability test as applied to extrajudicial testimonial statements, noting, "Reliability is an amorphous, if not entirely subjective, concept. There are countless factors bearing on whether a statement is reliable." (*Id.* at p. 63.) As defendant properly concedes, we do not have a Confrontation Clause problem here since the declarant testified at trial. Nevertheless, we find it appropriate to consider the factors cited by *Wright* as bearing upon the reliability determination. They are: (1) spontaneity and consistent repetition, (2) the mental state of the declarant, (3) use of terminology unexpected of a child of similar age, and (4) lack of a motive to fabricate. (*Wright*, *supra*, at pp. 821-822; *People v. Eccleston* (2001) 89 Cal.App.4th 436, 445 (*Eccleston*).) Another relevant consideration is the child's truth competence. (Cf., *In re Cindy L.* (1997) 17 Cal.4th 15, 30.) There may well be other circumstances that bear upon the question. At bottom, the inquiry is whether the content or circumstances surrounding the making of the statement indicate that the child was likely to be telling the truth.

In this case, the reliability factor of principal importance is the consistency of M.'s descriptions of where and how defendant touched her. Although neither statement was spontaneous, M.'s questioners did not pose leading questions. She was asked to tell what happened. True, she went from saying that defendant had touched her every day, and more than hundred times, to describing only a few actual events. She was also unclear about the year or years during which the touching took place. But the inconsistency in these abstract concepts (numbers and dates) does not detract from the consistency with which the child described the concrete facts. In both her interview with Ichige and her testimony at the preliminary hearing, M. described defendant touching her crotch area, between her legs, and she denied that defendant had touched her anywhere else. M. consistently maintained that the touching took place at the home when no one else was

12

around. And in both statements she was clear that there had been more than one such touching.

The relatively minor inconsistencies relating to the touches themselves do not detract from the overall consistency of her descriptions. In *Eccleston*, *supra*, 89 Cal.App.4th at page 446, the victim had recounted her story to a number of sources in various ways, once saying that the defendant liked to " 'suck[] [her] toes and lick[] [her] feet,' " and another time she said the defendant would " 'lick [her] feet and suck [her] fingers.' " The Supreme Court concluded that the inconsistencies in the details were not sufficient to necessitate exclusion of the out-of-court statements, because the "outline of abuse," was consistent. (*Ibid.*) The same is true here.

The assessment of M.'s truth competence does not weigh heavily for or against reliability. Both Ichige and the court presiding at the preliminary hearing asked M. questions to assess her ability to tell truth from falsity. When interviewed by Ichige, M. was not consistently able to distinguish between true statements and false ones. At the preliminary hearing she once answered "no" when asked if it was "bad" to tell a lie. But she was able to distinguish between a true statement and a false one when the statement concerned a concrete fact. And upon questioning by counsel, M. demonstrated that she did, indeed, understand that telling a lie was something for which she would get in trouble.

The other circumstances surrounding the two challenged statements tend to indicate reliability. The physical circumstances under which the two prior statements were made were not coercive or frightening. The interview with Ichige took place in a room designed to put children at ease. M. denied being scared when she testified at the preliminary hearing. No one prompted her. There was no evidence that she had any motive to lie. That is, there are no circumstances to suggest that M. fabricated or embellished that which she actually experienced.

13

In sum, the general consistency of M.'s description of the abuse she suffered, coupled with the circumstances surrounding both statements, are sufficient indicia of reliability to satisfy the statutory requirement. Even though there were some inconsistencies in M.'s statements, there was enough consistency to protect defendant's right to due process. Indeed, the admission of evidence violates due process only if it offends " 'fundamental conceptions of justice.' " (*Dowling v. United States* (1990) 493 U.S. 342, 352.) The United States Supreme Court has recently explained in the context of extrajudicial identifications that the federal Constitution, "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." (*Perry v. New Hampshire* (2012) 565 U.S. __ [2012 U.S. LEXIS 579] [132 S.Ct. 716, 723].) Those means include the right to counsel, compulsory process, and the right to confront and cross examine witnesses against him. (*Ibid.*)

Defendant had the means to try and persuade the jury that M.'s statements were unreliable. M. was present and testified at trial. Defendant had counsel and the opportunity to cross-examine M. And, since the trial court admitted both prior statements in their entirety, defendant was entitled to exploit any inconsistencies in the statement in attacking M.'s credibility. We conclude, therefore, that admitting M.'s two prior statements was not fundamentally unfair to defendant.[2]

---

[2] The Attorney General also argues that, although the prosecution offered the evidence under Evidence Code section 1360, there was a nonhearsay basis for admitting it. We need not reach this portion of the Attorney General's argument because we find no violation of either statutory or constitutional requirements in admitting the evidence for its truth under Evidence Code section 1360.

14

*C.*     *Disposition*

The judgment is affirmed.

_____
                                               Premo, J.

WE CONCUR:

_____
        Rushing, P.J.

_____
        Elia, J.

15