Filed 2/6/23 P. v. Martinez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>YOVANI DEJESUS MARTINEZ,<br><br>Defendant and Appellant. | F082991<br><br>(Super. Ct. No. VCF347222)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County. Melinda Reed, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted appellant Yovani DeJesus Martinez of 10 felonies involving sex-related crimes committed with his daughter, who was eight years old when she first reported the abuse. Appellant was convicted of two counts of sexual penetration of a child under the age of 10 years (Pen. Code, § 288.7, subd. (b);[1] counts 1 & 2); six counts of committing a lewd act upon a child (§ 288, subd. (a); counts 3-8); one count of possession of child pornography (§ 311.11, subd. (a); count 9); and one count of using a minor to create pornography (§ 311.4, subd. (c); count 10). He received an aggregate indeterminate prison term of 30 years to life, along with a consecutive determinate sentence of 20 years.

In general, appellant alleges that certain evidentiary and sentencing errors occurred at trial, and his counsel rendered ineffective assistance. We reject most of his claims. However, we agree with the parties that the subordinate determinate sentence imposed in count 10 must be reduced from two years to eight months. We further agree that certain fees and fines must be vacated. We will direct the trial court to prepare an amended determinate abstract of judgment that reflects these modifications. As modified, we affirm the judgment.

## BACKGROUND

At trial, appellant's daughter, the Victim, testified that appellant had touched her vagina with his penis and/or hand on multiple occasions when she stayed with him at his residence. In contrast, appellant denied ever touching her inappropriately, and he offered legitimate reasons why he had possibly touched her vagina, such as applying medication. Based on the verdicts rendered, it is apparent that the jury rejected appellant's version of events and found the Victim credible. We summarize the material facts that support the judgment.

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

2.

## I.     Appellant and his Ex-Wife Separate.

Appellant and his ex-wife, M.L., are the Victim's parents.  The Victim was born in December 2008.  In 2014, M.L. filed for divorce from appellant.  She was the one who ended the relationship.  Thereafter, they had joint custody of the Victim, and they took turns with physical custody.

M.L. began a relationship with a new man, the Boyfriend, and she eventually had two children with the Boyfriend.  After this new relationship started, appellant would frequently insult M.L. or her Boyfriend.  However, appellant also made it clear that he wanted to resume a romantic relationship with M.L.

## II.     Appellant Accuses his Ex-Wife's Boyfriend of Molesting the Victim.

In August 2016, M.L. obtained a three-year restraining order against appellant after he began stalking and harassing her.  Under the terms of the order, appellant could not have contact with M.L. unless it pertained to the Victim.  To comply with both the restraining order and their child custody agreement, appellant and M.L. utilized the residence of M.L.'s mother as the location for an exchange of physical custody.

In 2016, about a week after appellant was served with notice of the pending restraining order, appellant accused the Boyfriend of molesting the Victim.  M.L. suspected that appellant had fabricated these allegations to disrupt her relationship with the Boyfriend.  Appellant attempted to obtain a restraining order against the Boyfriend, but a judge denied that request.

In early 2017, appellant renewed his accusations with law enforcement, claiming he had evidence that either the Boyfriend or the Boyfriend's 18-year-old nephew were molesting the Victim.  Law enforcement launched an investigation, testing (in part) a pair of the Victim's panties, and interviewing everyone allegedly involved.  M.L. was cooperative.  The Boyfriend and his nephew were cooperative.  The Victim underwent a

3.

"CART" interview.[2] This investigation was ultimately closed due to a lack of evidence. No probable cause existed to arrest either the Boyfriend or his nephew.

### III. The Victim Discloses Appellant's Abuse.

On February 3, 2017, the Victim was eight years old and she disclosed to M.L. that it was appellant who had been touching her inappropriately. This disclosure occurred just prior to a physical custody exchange. While waiting for appellant to arrive at the location, the Victim began crying and she told M.L. that she did not want to go with appellant. According to M.L., it appeared that the Victim was having a panic attack. The Victim said it was appellant who had done everything to her that she had previously alleged against the Boyfriend. M.L. asked the Victim if she was lying. The Victim insisted she was telling the truth, and she asked M.L. to call the police so she would not have to go with her father.

M.L. contacted authorities, and a law enforcement officer responded to the scene a short time later. The Victim's eyes were red as if she had been crying. The Victim reported to the officer that appellant had touched her "private parts" when they were in bed. This disclosure to the officer happened outside M.L.'s presence.

In February 2017, the Victim underwent a second CART interview. She reported that, the previous week, she had told her mother that it was appellant who did "bad things" to her. The Victim stated that appellant "gets on top of" her. She felt his "tummy" on top of her "tummy." This had occurred four or five times when the Victim was asleep with appellant in the same bed. When asked by the interviewer how the Victim knew it was not a dream, the Victim stated that, when she woke up, she would not be wearing any underwear and her stomach would hurt.

---

**2**     A CART interview involves a specially trained interviewer who elicits information from a minor about alleged sexual crimes.

The Victim told the interviewer that she did not want to go with appellant because she did not want him "to do that" anymore. The Victim admitted during the second CART interview that she had previously falsely accused the Boyfriend of molesting her. She said she made those allegations because appellant had instructed her to do so. According to the Victim, appellant had wanted the Boyfriend to go to jail so he could renew a romantic relationship with the Victim's mother, M.L. During the second CART interview, the Victim said that the Boyfriend had never done "bad things" to her.

## IV. Law Enforcement Discovers Incriminating Evidence on Appellant's Phone.

In February 2017, appellant met with law enforcement officials. He voluntarily turned over both his and the Victim's cellular telephones. Law enforcement eventually extracted relevant information from both phones.

On February 4, 2017, appellant had sent a text message to the Victim which read, "Daddy's princess made lies, and that's why daddy is very sad to the princess to tell lies when daddy told her not to say." This text message had been sent the day after the Victim had first disclosed to her mother and law enforcement that appellant was touching her inappropriately. On the day that the Victim first disclosed this abuse, a police officer had spoken with appellant on the telephone and explained why the child custody exchange was not going to occur.

On appellant's phone, law enforcement discovered nude photographs of the Victim. A picture taken on or about April 23, 2016, showed her buttocks. Several pictures taken on or about September 30, 2016, showed the Victim fully nude. In another photo, the Victim is naked and lying on the bed with her eyes and legs closed, but her vagina is visible. In another photo, the Victim is posed nude in a "seductive manner." One of her legs is laid out to the side, and both of her hands are above her head.

In three photos taken on or about September 30, 2016, the Victim's vagina is depicted in "close-up" shots. In two of the photos, appellant is seen "opening" her

5.

vagina. In one photo, appellant uses his finger to manipulate her vagina, and in the other photo, he uses his thumb to do so. The third photo is of the Victim's vagina with her legs spread.

The pictures of the Victim's vagina were kept in a clandestine app on appellant's cell phone that looked like a calculator. That app also contained photos of naked adult women and photos of appellant's own erect penis. One photo of his penis showed appellant with lubricant on his fingers.

A review of his phone demonstrated that appellant had visited various pornographic websites, and he had viewed certain pornographic videos. These included two videos that were titled: (1) "Father Abused a Sleeping Girl" and (2) "Teen Girl Forced By Father Sucking His Cock, Cam77.com." These were deleted from the phone's history. Law enforcement did not access these videos, and they did not know whether they involved child or adult actors. Appellant also had web searches for strippers and for escort services.

Appellant's phone also contained videos of the Victim. In one video, he is seen touching and grabbing the Victim's buttocks, while pulling down her underwear a little. He refers to her "sexy body." He says, "I don't know what I am going to do with this old lady … that has me very crazy." In another video, appellant and the Victim are lying on a bed. Appellant is making snoring sounds and moaning. In Spanish, he says, "Mmm, there baby, ooh yes my love, mmm, mmm." The Victim is topless. In a final video, the Victim refers to appellant's "butt cheeks" and her own "butt." She also references "your junior" when speaking with appellant.[3]

The jury learned that the Victim referred to appellant's penis as "Junior." M.L. testified that, when she was in a relationship with appellant, she and appellant referred to

---

[3] The jury also saw a very short clip of appellant kissing the Victim on her mouth. The Victim testified that appellant only kissed her when saying goodbye or dropping her off at school.

his penis as "Junior." Appellant acknowledged that M.L. used the term "Junior" to refer to his penis.

## V. The Victim's Trial Testimony.

The Victim was 12 years old at the time of trial. She testified that, until she was eight years old, she would stay with appellant on the weekends. She shared a bedroom with appellant, and that room had two beds. She explained that, when she would go to sleep in her own bed, appellant would talk about ghosts or some other scary subject. She would then crawl into bed with him because she was frightened. The Victim told the jury that on multiple occasions, and occurring at least 10 times, if not more, she would be in his bed and he would climb on top of her naked and place his penis or hand against her vagina. She always fell asleep in either sweatpants and a tank top, or a nightgown. She always wore underwear. When she woke, she would find her clothes to be inside out and/or on backwards.

The Victim told the jury that appellant wanted to bathe with her when she stayed with him. On more than one occasion, but less than five occasions, appellant instructed her to jump on top of him when they were together in the bathtub, and he had her place her vagina against his penis. He would grab her hips when she did this. He told her that this was a game. The Victim would feel a sharp pain or burning sensation in her vagina. The first of these incidents in the bathtub occurred when the Victim was six or seven years old. The last incident occurred just before she stopped having contact with him.

The Victim admitted to the jury that she had previously falsely accused the Boyfriend of molesting her, and she confirmed that the Boyfriend had never touched her inappropriately.[4] She explained that she had falsely accused the Boyfriend because she had felt scared and pressured to do so from appellant. The Victim knew that appellant

---

[4] The Victim also testified that the Boyfriend's nephew never touched her inappropriately.

7.

did not like the Boyfriend, and appellant had told her that he had found something on her underwear. He had repeatedly asked her if the Boyfriend had been abusing her. Appellant had warned her that he could have her mother, M.L., jailed if she (the Victim) did not explain what had happened. Appellant then covered her face and he tried to take off her pants. It was at that moment that she relented and told appellant that it was the Boyfriend who was abusing her.

The Victim denied recalling ever having a rash on her vagina or remembering appellant ever putting medication on her vagina. She told the jury that, because she had been scared, she never told anyone it was appellant who was sexually abusing her. She eventually told her mother, M.L. while they were in their vehicle outside the residence of the Victim's grandmother's residence shortly before appellant was scheduled to pick her up. She testified that she disclosed what was happening because she was scared it would occur again. She stated that she still loved her father, but she "deserved" her own "justice" and she believed he deserved "to go to jail."

## VI.    The Defense Evidence.

### A.    Appellant's testimony.

Appellant testified at trial, denying any wrongdoing. He said he had never touched the Victim's vagina for a sexual purpose, and when he touched her, such as her buttocks as seen in one video, it was "just a game." He claimed that he had touched the Victim around her vagina only to apply a cream-based medication. He said he did this over 10 times, including when the Victim was asleep.

Appellant denied telling the Victim to accuse the Boyfriend, and he denied pressuring her in this regard. He denied ever threatening to have M.L. jailed. He told the jury that he did not know why the Victim would say that he had told her to accuse the Boyfriend.

8.

Appellant admitted taking pictures of the Victim's vagina, including those with his finger or thumb in the pictures. He claimed that he did so because Child Protective Services had advised him that it would help him gain physical custody of her. He claimed he took the pictures because the Victim "had a rash" and he was "applying cream."[5] He stated that he photographed his finger near the Victim's vagina to point out a rash. He also claimed that he took pictures of the Victim's vagina with her legs spread open because he saw a discharge of "transparent liquid." He claimed that he showed two such photos to his mother. He believed the discharge was the result of sexual abuse by the Boyfriend. He testified that, after showing the pictures of the Victim's vagina, he deleted them from his phone without showing them to police.

Regarding other naked photos of the Victim, appellant claimed he took those to make her feel more comfortable before he applied the medication to her vagina, and/or because she wanted him to photograph her naked. He testified that it was the Victim's decision to pose naked on the bed in a seductive manner. He explained that she "really just likes to take pictures." He claimed that he took the April 23, 2016, picture of the Victim's buttocks because she had complained that M.L. or the Boyfriend had hit her.

Appellant admitted that he kept photos of the Victim's vagina in a clandestine app on his phone, which looked like an app for a calculator. Inside this app he also kept photos of naked adult women and of his penis. He claimed that, for privacy purposes, he put the photos of the Victim's vagina in that app so that the Victim or anyone else who

---

**5** At trial, M.L. explained that, when the Victim was about five or six years old, she did have a rash on or around her vagina, and M.L. had applied a cream a few times. However, M.L. testified that, after that time, the Victim never again had issues with her vagina. In contrast, Appellant claimed at trial that it was around September 2016 when the Victim was prescribed a cream. He admitted that his testimony in this regard was in conflict with both M.L. and the Victim.

9.

used his phone would not have access to them.[6] He explained that, regarding the pictures of his own penis, he had had surgery to reconstruct his "urinary vein" and he had taken the photos to show his physician because urine was leaking from his penis. He claimed his penis was not "erect" but it had a "device" there.

Appellant admitted that he watches adult pornography, and he did so at times with a prostitute in a motel. He denied seeking out a video titled "Father Abused a Sleeping Girl." He said that the link to that video just happened to be on a website he was visiting. He explained that he was indiscriminate when it came to viewing pornography, and he watched whatever was on the screen. He denied having any sexual fantasies of abusing his daughter while she was sleeping. He admitted watching a video in January 2017 titled "Fucking My Girlfriend's Sister While She Sleeps." He denied that this type of pornography aroused him.

Appellant admitted taking showers with the Victim until she was about seven and a half years old. He agreed that he stopped washing her vagina about two months before she turned eight. He testified that he and M.L. had showered together with the Victim when they were still married, and he continued showering with the Victim after their divorce. He explained that people from Mexico would not find this behavior unusual.[7] He claimed that the Victim had asked him to shower with her, and he was only with her during baths to wash her hair.

---

[6] Appellant also had at least one picture of his ex-wife, M.L., in that clandestine app.

[7] At trial, M.L. agreed she had previously told an officer that she did not find it odd that appellant showered with the Victim because they had both showered with her ever since she was an infant. M.L. also testified that the Victim does not like to sleep alone and she used to sleep with M.L. and appellant in the same bed.

10.

### B. The testimony from appellant's various family members.

Some of appellant's family members testified on his behalf. In general, they told the jury that they had never witnessed appellant acting inappropriately with the Victim. They also had not seen any concerns regarding that relationship.

Appellant's mother denied ever seeing a rash on the Victim when she had cared for her, but she remembered that M.L. had sent a cream that had to be applied. Appellant's mother, however, had trouble remembering the precise time period when the Victim may have had a rash. She agreed that, in February 2017, she had told investigators that it had been over a year since she had seen anything regarding the Victim's vagina, and it had been two years since she had put cream on the Victim's vagina.

Appellant's mother initially testified that she had seen the nude photographs that appellant had taken of the Victim, and the mother understood that they were evidence that the Victim had been touched inappropriately. The mother also heard the Victim say that the Boyfriend had been molesting her. However, on cross-examination, appellant's mother agreed that appellant did not actually show her the photographs of the Victim's vagina. Instead, he only told her about them.

## DISCUSSION

We address appellant's claims in the order that they appear in his opening brief.

### I. Appellant has Forfeited his Claim that the Trial Court Erred in Permitting Admission of the Second CART Interview and any presumed Error is Harmless.

Evidence Code section 1360 provides an exception to the hearsay rule in criminal proceedings for certain statements made by child abuse victims under the age of 12.[8]

---

[8] The United States Supreme Court holds that, "[t]o be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial. [Citation.]" (*Idaho v. Wright* (1990) 497 U.S. 805, 822.)

11.

Among other requirements not relevant here, the trial court must find "in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability." (Evid. Code, § 1360, subd. (a)(2).)

Appellant argues that the trial court erred in admitting into evidence the Victim's statements made during her second CART interview in which she accused him of touching her inappropriately. He notes that the court never conducted the required hearing to determine the reliability of her statements, and he contends that the Victim's hearsay statements were unreliable. He maintains that his due process rights were violated. He asserts that he suffered prejudice, and reversal of all of his convictions is required.

### A. Background.

Prior to trial, the prosecution filed written motions in limine, which included a request that it be permitted to admit into evidence the recording of the Victim's CART interview in which she disclosed the abuse she was suffering from appellant. The prosecution's motion was based on Evidence Code section 1360. The prosecution asked the court to conduct a hearing to determine whether these statements were reliable.

When the matter was addressed pretrial, defense counsel pointed out to the court that the Evidence Code required the court to conduct a hearing to determine the reliability and trustworthiness of the Victim's statements during her CART interview. The court agreed it would conduct such a hearing. However, no such hearing occurred prior to trial.[9]

During trial, a recording of the Victim's second CART interview (People's exhibit No. 1) was played for the jury. Just before this was played, the court noted that the

---

[9] The parties agree that no such hearing occurred prior to trial. Our independent review of the record has also not discovered any such hearing.

defense did not object to its admissibility, and the court stated it had "specifically found in the prosecution's favor" regarding its admissibility.

Towards the end of trial, the court later stated for the record that it had previously indicated that it "would listen carefully to the preliminary and foundational testimony" regarding this CART interview "as it was being presented by the witnesses while the jury was present." The court stated it was "satisfied" that the foundational requirements had been met under Evidence Code section 1360 and that the CART interview "was appropriately played."

### B. Standard of review.

The parties dispute the appropriate standard of review. Appellant contends that this court should conduct an independent review regarding whether or not the Victim's statements were reliable during the CART interview. In contrast, respondent asserts that we should assess whether the trial court's ruling was an abuse of discretion.

Published opinions have taken conflicting approaches regarding the appropriate standard of review in this situation. Some courts consider this an evidentiary issue, triggering a mere abuse of discretion standard. (See *People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367; *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1330.) On the other hand, other courts have employed an independent standard of review to consider whether the child victim's hearsay statements were reliable. (*People v. Tatum* (2003) 108 Cal.App.4th 288, 296; *People v. Eccleston* (2001) 89 Cal.App.4th 436, 445–446.)

As we demonstrate below, we need not resolve the parties' dispute or fully respond to their various arguments regarding the appropriate standard of review. Instead, this claim fails under either approach because this issue is forfeited and any presumed error is harmless.

13.

## C.     Analysis.

### 1.     *This claim is forfeited.*

The parties dispute whether or not this claim is forfeited. Respondent argues that appellant did not object to this evidence when it was introduced at trial. In contrast, appellant contends he has preserved this issue for appellate review because his trial counsel reminded the court before trial that it was required to determine outside the jury's presence whether or not the Victim's statements during her CART interview were reliable. In the alternative, appellant raises a claim of ineffective assistance of counsel.

Respondent has the better argument. A criminal judgment cannot be set aside by the erroneous admission of evidence unless a timely objection was made setting forth a "clear" and "specific ground" for the objection. (Evid. Code, § 353, subd. (a).) A reviewing court must also determine that the admitted evidence should have been excluded on the ground stated and the error "resulted in a miscarriage of justice." (*Id.* at subd. (b).) Our Supreme Court holds that an objection must "inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida* (2005) 37 Cal.4th 428, 435; accord, *People v. Seijas* (2005) 36 Cal.4th 291, 302.)

Here, the defense did not object when the second CART video was played for the jury. Indeed, the court noted that the defense was making no objection, a point which the defense never disputed or corrected. Consequently, this issue is deemed forfeited. Appellant failed to make a timely and specific objection on the ground now asserted on appeal. Thus, this issue was not preserved for appellate review. In any event, we also determine that this claim fails due to a lack of prejudice.[10]

---

[10]     Because this claim fails for lack of prejudice, we need not fully analyze appellant's assertion that his trial counsel was ineffective in not preserving this issue for appeal. Appellant cannot meet his burden of showing that he was harmed. Thus, his

### 2. *Any presumed evidentiary error is harmless.*

The California Supreme Court has identified the following factors as being relevant in determining the reliability of hearsay statements made by a child witness in a sexual abuse case: (1) spontaneity and consistent repetition; (2) the declarant's mental state; (3) use of terminology unexpected of a child of a similar age; (4) lack of motive to fabricate; and (5) the child's ability to understand the duty to tell the truth, and to distinguish between truth and falsity. (*In re Cindy L.* (1997) 17 Cal.4th 15, 29–30; see *In re Lucero L.* (2000) 22 Cal.4th 1227, 1250.)

Appellant maintains that the Victim's statements during her CART interview were not sufficiently reliable. He acknowledges that no evidence suggests the Victim's mental state was impaired. However, he contends that the Victim's allegations were not consistently repeated. He also argues that the Victim had a motive to lie to falsely accuse him. Finally, he asserts that her statements during the CART interview were not sophisticated and did not suggest that her claims of sexual abuse had occurred. He relies on *People v. Eccleston*, *supra*, 89 Cal.App.4th 436, and *People v. Brodit*, *supra*, 61 Cal.App.4th 1312, to establish error. He contends it is reasonably probable this evidence impacted the outcome of his trial. We disagree.

We need not analyze whether or not the Victim's statements during her CART interview were reliable. We also need not summarize appellant's cited authorities. Instead, this record reveals that, even if forfeiture did not occur and the CART interview was erroneously played at trial, any presumed evidentiary error was overwhelmingly harmless.

The prosecution introduced evidence that conclusively established appellant's guilt. The Victim testified that appellant had touched her vagina with his penis and/or hand on multiple occasions when she stayed with him at his residence. Her trial

---

claim of ineffective assistance of counsel must be rejected. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687–688; *People v. Lucas* (1995) 12 Cal.4th 415, 436.)

15.

testimony was credible and consistent with her pretrial statements. On the night the Victim disclosed this abuse to her mother, she told an officer that appellant had touched her "private parts" when they were in bed.

The Victim's testimony was amply corroborated by the evidence located on appellant's phone. He had numerous naked photos of the Victim, and one showed her in a "seductive manner." He kept photos of her vagina hidden in a clandestine app that looked like a calculator, and those photos were kept with pictures of naked adult women and images of his own erect penis. In two of the pictures involving the Victim, appellant used his finger in one picture and his thumb in another picture to open her vagina. Despite claiming he had taken photos of her vagina as possible evidence to gain custody of the Victim, appellant admitted that he never showed these pictures to law enforcement.

Appellant had a video wherein he touched and grabbed the Victim's buttocks, while pulling down her underwear a little. He referred to her "sexy body." He says, "I don't know what I am going to do with this old lady … that has me very crazy." In addition, the jury learned that, the day after the Victim first disclosed the abuse to her mother and then to law enforcement, appellant sent a text message to the Victim saying he was "very sad" because his "princess" told lies and he had "told her not to say."

The evidence located on appellant's phone overwhelmingly corroborated the Victim's trial testimony and confirmed the ongoing abuse. In contrast, the Victim disclosed very few details about the abuse during the second CART interview, only reporting that appellant did "bad things" to her and he put his "tummy" on hers. She also explained in this interview that she had previously accused the Boyfriend of molesting her because appellant had instructed her to do so. Appellant had wanted the Boyfriend to go to jail so he could renew a romantic relationship with M.L.

At trial, the Victim provided more details about why she had previously falsely accused the Boyfriend. She explained that she had felt scared and pressured to do so. The Victim knew that appellant did not like the Boyfriend, and appellant had told her that

16.

he had found something on her underwear. He had repeatedly asked her if the Boyfriend had been abusing her. Appellant had warned her that he could have her mother jailed if she did not explain what had happened. Appellant then covered her face and he tried to take off her pants. It was at that moment that she relented and told appellant that it was the Boyfriend who was abusing her.

With CALCRIM No. 226, the jurors were instructed to consider the Victim's prior false statement and to give it whatever weight they deemed necessary. Based on the verdicts rendered, it is apparent that the jury found the Victim's testimony credible.

During closing argument, the prosecutor did not rely on the CART interview to demonstrate appellant's guilt. Instead, it was only mentioned a few times to establish when this abuse had ended, and to remind the jurors that the Victim had said during the interview that she had felt appellant's "tummy on her tummy," and "she could feel his feet." The jurors were told that they could consider the CART interview and give it the same weight and value as the Victim's trial testimony. The prosecution, however, argued that appellant's guilt was shown through the Victim's trial testimony, her demeanor, the photos and videos found on appellant's cell phone, and through appellant's numerous lies. The prosecutor asked the jury to consider the circumstances surrounding the Victim's initial disclosure to her mother. The prosecutor asserted that the Victim had no motive to lie, and the photos and videos found on appellant's phone showed that she was telling the truth. The prosecutor reminded the jurors that, the day after the Victim disclosed this abuse, appellant had sent her a text message saying he was sad because he had told her "not to say."

Appellant's defense counsel argued to the jury that, during this CART interview, the Victim had not talked about penetration or that appellant supposedly put his finger on her vagina. She also did not mention showering with appellant, which was only discussed in court. Defense counsel noted that appellant is a "pretty big man" and the Victim "was very small at eight years old." Counsel noted that the Victim never stated in

her CART interview that she had felt suffocated or had difficulty breathing when appellant was on her.

During the prosecution's short rebuttal argument, the CART interview was never again mentioned or discussed.

We reject appellant's arguments that his right to due process was violated from the introduction of the CART interview. Instead, appellant had a full and fair opportunity to confront and cross-examine the Victim at trial. He was also not prevented from presenting his defense to the jurors, claiming he had never touched her or photographed her for a sexual purpose. It is apparent, however, that the jury found appellant's testimony lacking in any credibility.

Based on this record, any presumed error was harmless regarding the playing of the CART interview at trial. We can declare beyond any reasonable doubt that this evidence did not contribute to the jury's verdict. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) In other words, the record reveals that this presumed error was unimportant in relation to everything else the jury considered regarding appellant's guilt. (*Yates v. Evatt* (1991) 500 U.S. 391, 403, disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72–73, fn. 4.) Likewise, it is not reasonably probable the verdicts would have been more favorable to appellant absent this presumed error. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) Consequently, appellant's arguments are without merit, and this claim fails.

## II. The Trial Court did not Abuse its Discretion in Permitting the Jury to Learn that Appellant had Viewed the two Pornographic Videos and any Presumed Error is Harmless.

Appellant contends that the trial court abused its discretion in allowing the jury to learn about the titles of two pornographic videos that he had viewed on his cell phone. He argues that the admission of this evidence rendered his trial fundamentally unfair, and he seeks reversal of all of his convictions.

## A.     Background.

Prior to trial, the prosecution filed a written motion in limine seeking permission to introduce into evidence the titles of three pornographic videos which appellant had apparently viewed on his phone. The defense opposed this request, arguing that this evidence was more prejudicial than probative.

The prosecution eventually narrowed its request to introduce only two of the titles discovered on appellant's phone: (1) "Father Abused a Sleeping Girl" and (2) "Teen Girl Forced By Father Sucking His Cock." The prosecutor acknowledged that the website from where these videos were downloaded likely used adult actors, and it did not have child pornography on its platform. Nevertheless, the prosecutor asserted that these titles were probative of appellant's possible interest in sexual relationships between fathers and daughters. After hearing the arguments, the court ruled that these two titles would be admissible at trial because they were relevant regarding appellant's alleged sexual intent.

The jury learned that appellant had visited pornographic websites on his phone, including the videos referenced above which had been deleted from the phone's history. Law enforcement did not access these videos, and they did not know whether they involved child or adult pornography. Appellant also had web searches for strippers and for escort services.

## B.     Standard of review.

An abuse of discretion standard is used to review a trial court's rulings regarding relevancy and admissibility under Evidence Code section 352. (*People v. Jones* (2017) 3 Cal.5th 583, 609.) Likewise, this standard is used to review a trial court's ruling admitting evidence under Evidence Code section 1101. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824.)

Under this standard, we will not disturb the trial court's decision on appeal unless "the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v.*

*Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; see *People v. Williams* (1998) 17 Cal.4th 148, 162 [abuse of discretion review asks whether ruling in question falls outside bounds of reason under applicable law and relevant facts].)

### C. Analysis.

Appellant contends that he only viewed adult pornography and these two disputed videos did not depict actual minors. He argues that the issue for the jury was whether he had held sexual intent for his own daughter, but these videos were "adult in nature" and, thus, their probative value was greatly outweighed by the danger of undue prejudice. He maintains that the introduction of these titles rendered his trial fundamentally unfair.

We reject appellant's arguments. The trial court did not abuse its discretion and any presumed evidentiary error was harmless.

#### 1. *The court did not abuse its discretion.*

Evidence Code section 1101, subdivision (a), prohibits the introduction of propensity evidence to prove a defendant's conduct on a specific occasion. (*People v. Jackson* (2016) 1 Cal.5th 269, 299.) However, character evidence can be admitted under Evidence Code section 1101, subdivision (b), when offered for a non-propensity purpose, such as motive or intent. (*People v. Jackson*, *supra*, 1 Cal.5th at p. 300.) For this inquiry, the degree of similarity between the charged and uncharged conduct is often a key factor, and a "continuum exists" concerning the degree of similarity required. (*Ibid.*) The least degree of similarity is required to prove intent. (*Ibid.*) In contrast, a higher degree of similarity is required to prove a common design or plan, and the highest degree of similarity is required to prove identity.[11] (*People v. Jackson*, *supra*, 1 Cal.5th at p. 300.)

---

[11]     Evidence Code section 1108 permits admission of evidence regarding a defendant's uncharged sexual offenses when such evidence is relevant to show his or her propensity to commit similar sex crimes, so long as the admission of this evidence does not violate Evidence Code section 352. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1013; *People v. Falsetta* (1999) 21 Cal.4th 903, 915.) In a footnote, appellant

Here, appellant disputed the charges filed against him, making his criminal intent a relevant issue for the jury. To prove that he had committed lewd acts, the prosecution was required to show that he had acted with the intent of arousing, appealing to, or gratifying his lust, passions or sexual desires. (§ 288, subd. (a); CALCRIM No. 1110.)

It was undisputed that appellant had viewed a wide variety of adult pornography, including videos with titles that purported to show one father sexually abusing his daughter, and another father forcing his daughter to perform fellatio. Although these two disputed videos may have depicted adult performers, that does not lessen the relevancy of their titles. Instead, those titles strongly suggested that the videos purported to depict sexual acts occurring between family members and involving females who were supposedly underaged. Because he watched these videos, the circumstantial evidence strongly suggested that appellant may have derived sexual gratification from scenes of incest, or daughters abused and/or forced to perform sex acts. As such, these titles had a tendency in reason to prove or disprove a disputed issue of fact that was of consequence to the action. (Evid. Code, § 210.) Thus, this evidence was relevant to the issue of appellant's criminal intent regarding his own underaged daughter, and whether he had intended to commit lewd acts with her. Accordingly, these titles had probative value. Indeed, the title regarding a father abusing his sleeping daughter was extremely similar to some of the charged behavior in this matter.

Appellant argues that the second disputed video purported to show fellatio, but he was not charged in this matter with oral copulation. According to appellant, there was no similarity between that video's title and his conduct with the Victim. Thus, appellant contends that, at the very least, the court abused its discretion in allowing the jury to learn

asserts that Evidence Code section 1108 is inapplicable in this situation. He notes that the parties agreed below that these two pornographic videos involved adult rather than child actors. We agree that Evidence Code section 1108 is inapplicable here because nothing establishes that appellant committed a criminal offense when watching or possessing these videos.

21.

that he had visited that second website.  We disagree.  Although appellant was not charged with oral copulation in this matter, the title of the second video was nevertheless relevant to the pending charges.  Just like the first video, the second video reasonably suggested that appellant had an unnatural sexual interest regarding fathers and daughters. The second video also reasonably demonstrated that appellant had a repeated and ongoing desire to view videos depicting this theme.  Thus, even the second video had probative value, and we cannot state that the trial court abused its discretion in determining that both videos were relevant.

Finally, we reject appellant's arguments that the introduction of these titles was more prejudicial than probative.  A trial court may exclude otherwise admissible evidence if its probative value is substantially outweighed by its prejudicial effect; that is, if its admission would result in the undue consumption of time, a danger of undue prejudice, confusion about the issues or the danger of misleading the jury.  (Evid. Code, § 352.)  "Evidence is substantially more prejudicial than probative [within the meaning of section 352] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]."  (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

The admission of this evidence did not result in an undue consumption of time. The jury learned about these titles through the testimony of the lead detective.  Her direct testimony in this regard was very short, overlapping in two pages of the reporter's transcript.  Nothing about this testimony demonstrates or even reasonably suggests that the jury would have been confused or misled.  Instead, the detective simply read the two titles from the forensic report which showed that appellant had found these videos on the internet, watched them, and subsequently deleted them from his browser's history.

Although the disputed titles conveyed subject matters that are deplorable, the jurors did not view the actual videos or see the acts which the titles suggested.  The brief mention of these two titles could not have possibly posed an intolerable risk to the

22.

fairness of the proceedings or the reliability of the trial outcome. Especially in light of the overwhelming evidence introduced against appellant, it does not appear reasonably likely that these titles would have inflamed the emotions of the average juror, motivating them to use this information to punish appellant. (See *Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1009 [setting forth these requirements to deem evidence more prejudicial than probative].) Consequently, it cannot be stated that this evidence was more prejudicial than probative. (Evid. Code, § 352.)

Based on this record, the trial court did not exercise its discretion in an arbitrary, capricious or patently absurd manner. The court's evidentiary ruling did not fall outside the bounds of reason under the applicable law and relevant facts. Further, a manifest miscarriage of justice did not occur. Thus, an abuse of discretion is not present and this claim fails. In any event, we also conclude that any presumed error was harmless.

### 2.     *Any presumed error was harmless.*

A trial court's discretionary ruling involving the ordinary rules of evidence does not normally implicate the federal Constitution. (*People v. Cudjo* (1993) 6 Cal.4th 585, 611; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1325 [disallowing defense evidence is not also the denial of the right to present a defense].) Thus, the standard under *Watson*, *supra*, 46 Cal.2d at p. 836, is the appropriate method to analyze any alleged harm from evidentiary error. (*People v. Cudjo*, *supra*, 6 Cal.4th at p. 611.) Under this standard, we ask whether it is reasonably probable the verdict would have been more favorable to the defense absent the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Here, during trial, appellant's counsel had the lead detective admit that she had no idea what the actual videos looked like. During closing argument, the prosecutor only briefly mentioned these disputed titles. The prosecutor asserted that these porn sites, along with appellant's possession of photos depicting the Victim's vagina, were

circumstantial evidence corroborating the Victim's testimony. The prosecutor also argued that these videos demonstrated that appellant had lied about randomly watching pornography. According to the prosecutor, this was "not a series of unfortunate events" and, instead, appellant had twice watched the video about the father abusing a sleeping girl. The prosecutor emphasized to the jurors that these titles were not meant to prove the charge of child pornography, which was established by the photos of the Victim. The prosecutor acknowledged to the jurors that adult pornography is "common" and "normal." The prosecutor stated that it is not a crime for consenting adults to watch adult pornography. However, the prosecutor argued that it was not a coincidence that appellant had watched these videos. Instead, this is what gratifies him sexually.

Although the prosecutor mentioned these titles during closing argument, they were not a cornerstone of the prosecution's case, and the prosecutor acknowledged to the jury that these titles were not meant to prove the child pornography charges. Moreover, this was not a close case. The prosecution introduced overwhelming evidence establishing appellant's criminal intent. The Victim's testimony was consistent and credible. The photos and videos recovered from appellant's phone corroborated her accusations that he had touched her inappropriately. Indeed, appellant twice photographed himself touching and manipulating her vagina. He also recorded himself touching her buttocks while pulling down her underwear slightly and describing her as having a "sexy body" and she was driving him crazy. Appellant kept photos of the Victim's vagina hidden on a secret app along with naked photos of women, and photos of his own erect penis. The day after the Victim disclosed this abuse, appellant texted her saying he was sad because he had told her "not to say."

Based on the overwhelming evidence introduced against appellant, it is not reasonably probable he would have obtained more favorable verdicts had the trial court precluded one or both of the disputed titles from being introduced into evidence. As such, any presumed evidentiary error is harmless, and this claim fails.

24.

**III.  Appellant Fails to Demonstrate that his Counsel was Ineffective in Failing to Seek a Limiting Instruction Regarding the Titles of the Pornographic Videos.**

Appellant contends that his trial counsel was ineffective because he failed to request a limiting instruction regarding the two titles of the pornography videos which were discovered on his cell phone and disclosed to the jury.  Based on alleged prejudice, he seeks reversal of all of his convictions.

In relevant part, CALCRIM No. 375 instructs jurors that, if they decide a defendant has committed uncharged acts, they may (but are not required to) consider such evidence for the limited purpose of deciding whether the defendant acted with the required specific intent to prove the charged offenses.  However, the instruction also informs the jurors that they cannot consider this evidence for any other purpose, and they cannot conclude from the evidence that the defendant has a bad character, or is disposed to commit crime.  (CALCRIM No. 375.)

It is undisputed that appellant's trial counsel did not request this limiting instruction, which was not read to appellant's jury.  The trial court did not have a sua sponte duty to provide this limiting instruction.  (*People v. Hawkins* (1995) 10 Cal.4th 920, 942, overruled on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89.)  Appellant argues that his trial counsel could have had no legitimate tactical reason for not requesting this limiting instruction.  He contends it is reasonably probable the outcome of this matter would have been different if his counsel had requested such an instruction.

We reject appellant's claim.  To show ineffective assistance of counsel, a defendant must establish two criteria:  (1) that counsel's performance fell below an objective standard of reasonable competence and (2) that he was thereby prejudiced.  (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 687–688.)  The defendant has the burden of showing both deficient performance and resulting prejudice.  (*People v. Lucas*, *supra*, 12 Cal.4th at p. 436.)  To establish prejudice, a defendant must demonstrate a

25.

reasonable probability that, absent the errors of counsel, the result would have been different. (*Ibid.*) This must be enough to undermine confidence in the outcome. (*Ibid.*)

In the present matter, we need not analyze whether or not defense counsel acted reasonably in failing to request a limiting instruction regarding the two disputed titles. Instead, appellant does not establish that he was prejudiced from his counsel's alleged ineffective assistance. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 164 ["If the defendant fails to show prejudice, a reviewing court may reject the claim without determining the sufficiency of counsel's performance."].) We have already concluded that overwhelming evidence was introduced to establish appellant's guilt for all of the charged crimes. Moreover, the prosecutor did not overly emphasize these two titles during closing argument, and the prosecutor informed the jurors that these titles were not intended to prove the child pornography charges. During the defense close, appellant's trial counsel argued to the jury that appellant had a history of looking at adult pornography, and he had sought out strippers and prostitutes. According to the defense, the disputed videos were not "his entire pornographic profile." Defense counsel asserted that his pornographic history showed that he is sexually attracted to adult women.

Based on this record, our confidence in the outcome of this trial is not undermined. (See *Strickland v. Washington*, *supra*, 466 U.S. at pp. 687–688; *People v. Lucas*, *supra*, 12 Cal.4th at p. 436.) Appellant's guilt was conclusively established. Thus, we reject appellant's assertion that this was a "relatively close case." He does not establish that a reasonable probability exists that the outcome of this matter would have been different had his counsel requested this limiting instruction. Accordingly, appellant does not show that his counsel rendered ineffective assistance, and this claim fails.

## IV. We Vacate any Remaining Balance Owed for the Presentence Probation Report.

At sentencing, the trial court ordered appellant to pay $500 to cover the cost of the presentence probation report pursuant to former section 1203.1b. The parties agree, as do

we, that it is appropriate to vacate any remaining balance of this imposed financial obligation.

Effective July 1, 2021, Assembly Bill No. 1869 (2019-2020 Reg. Sess.) repealed former section 1203.1b and abrogated the court's authority to impose and collect the probation report fee. This bill also enacted section 1465.9, which made any balance remaining due uncollectible and unenforceable. (*People v. Clark* (2021) 67 Cal.App.5th 248, 259–260.) Accordingly, we will vacate any remaining balance owed.

## V. Appellant Did Not Suffer Prejudice from the Sentencing Error in Counts 3 and 9.

In count 3, appellant was convicted of a lewd act (touching the Victim's vagina the first time) in violation of section 288, subdivision (a). The court deemed this conviction the principal determinate term, and it imposed an aggravated prison sentence of eight years.

In count 9, appellant was convicted of possession of child pornography in violation of section 311.11, subdivision (a). The court imposed an aggravated term of three years, but this sentence was stayed.

At sentencing, the trial court cited the following three factors in aggravation:

(1)     The Victim was particularly vulnerable because appellant committed some of the sexual offenses "on many occasions" when she was asleep;

(2)     The manner in which the crimes were committed demonstrated sophistication or professionalism on appellant's part because he had the Victim sleep in the same bed with him, and he convinced her to lie to law enforcement and report it was the Boyfriend who had committed these offenses; and

(3)     As the Victim's parent, appellant took advantage of a position of trust.

When this sentencing occurred in June 2021, the court had discretion to select a prison term that best served the interests of justice. (§ 1170, former subd. (b).) The court was permitted to consider the circumstances in aggravation or mitigation, "and any other

27.

factor reasonably related to the sentencing decision." (Cal. Rules of Court, former rule 4.420(b).) The court could rely on "the case record, the probation officer's report, other reports and statements properly received, statements in aggravation or mitigation, and any evidence introduced at the sentencing hearing." (*Ibid.*)

However, in October 2021, Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567) was signed into law, which amended section 1170, subdivision (b). (*People v. Dunn* (2022) 81 Cal.App.5th 394, 402 (*Dunn*).) Under the current law, the middle term is the presumptive sentence unless certain circumstances exist. (*Ibid.*) Effective January 1, 2022, a trial court may now impose an upper term sentence only where there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term. (*Ibid.*) Further, a trier of fact must have found true beyond a reasonable doubt those facts underlying all of the aggravating circumstances, or the defendant must have stipulated to them. (*Ibid.*) A court is required to state on the record the facts and reasons for choosing the sentence imposed. (§ 1170, subd. (b)(5).)

### A. This change in law retroactively applies to appellant.

The parties agree, as do we, that this change in law applies retroactively to appellant. A panel from this court has already held that Senate Bill 567 applies retroactively to criminal matters that are not yet final on appeal. (*Dunn*, *supra*, 81 Cal.App.5th at p. 403.) Because appellant's criminal matter is not yet final, he benefits from Senate Bill 567.

Although respondent concedes that Senate Bill 567 retroactively applies to appellant, respondent argues that a remand should be denied because any sentencing error was harmless. Respondent asks us to follow *People v. Flores* (2022) 75 Cal.App.5th 495, 500 (*Flores*). In contrast, appellant contends that a new sentencing hearing is required because the jury did not find true the factors in aggravation upon which the trial court relied. Appellant asserts that he was prejudiced because it is unknown what conclusions

28.

the jurors would have reached had they been asked to consider whether the aggravating factors were true. In general, appellant asks us to follow *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*). He urges us to not follow *Flores*, contending it was wrongfully decided.

We decline to rely on respondent's cited authority, *Flores*. Nevertheless, we agree with respondent that a remand is not warranted. Based on both *Lopez* and this court's opinion in *Dunn*, we conclude that any sentencing error was harmless.

### B. The approach articulated in Lopez.

In *Lopez*, the opinion upon which appellant relies, the Court of Appeal for the Fourth District, Division One, determined that, when a jury is required to find true a sentencing factor beyond a reasonable doubt and the court fails to submit that factor to the jury, that error may be deemed harmless if the reviewing court can conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every factor* on which the trial court relied in imposing the aggravated sentence. (*Lopez*, *supra*, 78 Cal.App.5th at pp. 465–466.) If the reviewing court cannot reach such a conclusion, the question then is whether it is reasonably probable[12] the trial court would have nevertheless imposed the upper term if it had recognized that it could permissibly rely on only one, a few, or none of the aggravating factors—rather than all of them—on which it previously relied. (*Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11.) If the answer to both of these questions is in the negative, a remand is required for the trial court to resentence the defendant. (*Ibid*.)

### C. The approach articulated in Dunn.

Following *Lopez*, this court in *Dunn* likewise held that, if an aggravated sentence was imposed in violation of Senate Bill 567, any error can be deemed harmless pursuant

---

[12] This standard is taken from *Watson*, *supra*, 46 Cal.2d at p. 836. (*Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11.)

to a two-step analysis.  (*Dunn*, *supra*, 81 Cal.App.5th at p. 401.)  The *Dunn* court, however, disagreed with *Lopez* in one aspect.  Instead of requiring a finding beyond a reasonable doubt that the jury would have found true *all* aggravating factors beyond a reasonable doubt, *Dunn* holds that a reviewing court need only conclude beyond a reasonable doubt that the jury would have found true beyond a reasonable doubt the facts underlying *at least one aggravating circumstance* supporting the imposition of the upper term. (*Dunn*, *supra*, at p. 401.)  If so, then regarding the remaining aggravating factors (if any) which the trial court originally relied upon, the issue is whether the reviewing court can then state that there is a reasonable probability the jury would have found the remaining aggravating circumstance(s) true beyond a reasonable doubt.  If these questions are resolved in the affirmative, then the sentencing error may be deemed harmless.[13]  (*Dunn*, *supra*, 81 Cal.App.5th at p. 401.)

The *Dunn* court explained in detail why it did not agree with *Lopez*'s holding that the federal standard of review under *Chapman*, *supra*, 386 U.S. 18, must be applied to *all* aggravating circumstances.  We do not recreate that full discussion here.  In general, however, *Dunn* was concerned that *Lopez* had not provided a full and clear explanation for its holding. (*Dunn*, *supra*, 81 Cal.App.5th at pp. 408–409.)  Moreover, *Dunn* noted that the California Supreme Court in *People v. Sandoval* (2007) 41 Cal.4th 825 holds that at least one aggravating factor must be proven to the *Chapman* harmless error standard to satisfy the Sixth Amendment of the United States Constitution, but ordinary errors of state law are subject to review pursuant to *Watson*, *supra*, 46 Cal.2d 818.  (*Dunn*, *supra*,

---

[13]    The *Dunn* court clarified that, in order to reach the second step of the analysis, the reviewing court must conclude beyond a reasonable doubt that the jury would have found at least one aggravating circumstance true beyond a reasonable doubt. Otherwise, the sentence violates the Sixth Amendment of the United States Constitution. (*Dunn*, *supra*, 81 Cal.App.5th at p. 401, fn. 5.)  In relevant part, the Sixth Amendment declares that an accused person in a criminal trial has the right to a speedy and public trial by an impartial jury.

81 Cal.App.5th at p. 409, citing *People v. Sandoval*, *supra*, 41 Cal.4th at p. 839.) Accordingly, *Dunn* holds that a minimum of one aggravating circumstance must be reviewed pursuant to *Chapman*, but the remaining aggravating circumstances (if any) involve only a state-created right to a jury trial that must be reviewed pursuant to *Watson*. (*Dunn*, *supra*, 81 Cal.App.5th at p. 409.)

Regarding the final step of the analysis, *Dunn* followed a similar approach to *Lopez*. According to *Dunn*, if at least one aggravating circumstance would have been found true but all aggravating circumstances would not have been found true, the reviewing court then asks whether there is a reasonable probability the trial court would have imposed the upper term sentence in light of the aggravating circumstances provable from the record. (*Dunn*, *supra*, 81 Cal.App.5th at p. 401.) If the answer is in the affirmative, the sentencing error may be deemed harmless. (*Ibid.*)

### D.     The approach articulated in Flores.

Both *Dunn* and *Lopez* disagreed with the opinion that respondent cites, *Flores*, *supra*, 75 Cal.App.5th 495. In *Flores*, the Court of Appeal for the First Appellate District, Division Three, held that sentencing error under Senate Bill 567 could be deemed harmless if a reviewing court can conclude beyond a reasonable doubt that the jurors would have found true beyond a reasonable doubt *at least one aggravating circumstance* had it been submitted to them. (*Flores*, *supra*, 75 Cal.App.5th at p. 500.)

Respondent asks us to follow *Flores*. However, both *Dunn* and *Lopez* criticized how *Flores* analyzed prejudice in this situation, finding it too narrow. (See *Dunn*, *supra*, 81 Cal.App.5th at p. 408; *Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11.) *Dunn* concluded that *Flores* was flawed in this regard because it did not provide "a complete standard" to analyze harmless error. (*Dunn*, *supra*, at p. 408.) We agree with the concerns articulated in *Dunn* regarding the analytical shortcomings appearing in *Flores*. As such, we decline to follow *Flores*. However, we nevertheless agree with respondent

31.

that the sentencing error in this matter is harmless. We reach that conclusion under the approaches articulated in both *Dunn* and *Lopez*.

### E. This matter.

We need not fully analyze the multiple steps articulated in either *Dunn* or *Lopez* to analyze harmless error in this situation. Instead, we need not go past the first inquiry. We can state beyond a reasonable doubt that the jury would have found true beyond any reasonable doubt *all* of the aggravating factors upon which the trial court relied to impose the upper term sentences.

The trial evidence overwhelmingly demonstrated that the Victim was particularly vulnerable. She was eight years old and younger when these crimes occurred, and appellant committed some of the sexual offenses when she was asleep. The evidence also overwhelmingly established that appellant committed these crimes in a sophisticated manner. The Victim explained that, when she would go to sleep in her own bed, appellant would talk about ghosts or some other scary subject. She would then crawl into bed with him because she was frightened. The Victim told the jury that on multiple occasions, and occurring at least 10 times, if not more, she would be in his bed and he would climb on top of her naked and place his penis or hand against her vagina.

Appellant also convinced the Victim to lie to law enforcement. He used duress to compel her to report it was the Boyfriend who had molested her. She explained that she had falsely accused the Boyfriend because she had felt scared and pressured to do so from appellant.

Finally, the evidence overwhelmingly showed that, as the Victim's parent, appellant took advantage of his position of trust to commit these crimes. At trial, the Victim said she loved appellant, and she had thought that he was committing these crimes for his own pleasure. She had wanted to make her father happy, and she had wanted to make him feel good.

32.

Appellant concedes that evidentiary support exists for all three of the factors in aggravation upon which the trial court relied. However, appellant asserts that, because those factors are subjective in nature, it is impossible for this court to determine beyond a reasonable doubt that the jury would have found any of them true. We disagree. The evidence conclusively and overwhelmingly established that the Victim was particularly vulnerable, appellant used a sophisticated approach to commit these crimes, and he abused his position of trust over her. Therefore, appellant's sentence does not violate the Sixth Amendment of the United States Constitution. (*Dunn*, *supra*, 81 Cal.App.5th at p. 401, fn. 5.) Under both *Dunn* and *Lopez*, this sentencing error may be deemed harmless. (*Dunn*, *supra*, 81 Cal.App.5th at p. 401; *Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11.) Consequently, we will not vacate the sentences in counts 3 and 9, and this claim fails.

## VI.   The Sentence in Count 10 is Reduced from Two Years to Eight Months.

For count 10, the jury convicted appellant of using a minor to create child pornography in violation of section 311.4, subdivision (c). For this conviction, the trial court imposed a subordinate determinate term of two years. The parties agree, as do we, that this sentence is erroneous. The probation report had a scrivener's error and it listed this conviction under section 311.4, subdivision (*b*), which has a longer sentencing triad. For the actual conviction in count 10, the sentencing triad under section 311.4, subdivision (*c*), is 16 months, or two or three years in the state prison. (See § 18, subd. (a).) Accordingly, appellant's subordinate determinate sentence in count 10 must be reduced to eight months, which represents one-third of the middle term.

We would normally remand this matter for resentencing. However, a remand is not warranted in this situation because the trial court otherwise imposed the maximum possible sentence against appellant. (See *People v. Buycks* (2018) 5 Cal.5th 857, 896,

fn. 15.)  Consequently, we will direct the trial court to issue an amended abstract of judgment reflecting this modification in appellant's sentence.

Finally, the determinate abstract of judgment has an additional clerical error regarding count 10.  The abstract incorrectly lists this conviction as occurring under section 311.11, subdivision (a).  We will direct the court to correct that mistake when it issues the amended abstract.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [an appellate court may correct clerical errors appearing in abstracts of judgment either on its own motion or upon application of the parties].)  The amended abstract shall reflect a conviction in count 10 in violation of section 311.4, subdivision (c).

## VII.	Appellant has Forfeited his Claim that Sentencing Error Occurred in Counts 1 and 2; In any event, this Claim Fails on its Merits and Appellant does not Demonstrate Ineffective Assistance of Counsel.

In counts 1 and 2, the trial court imposed consecutive prison sentences of 15 years to life for appellant's sexual penetration of the Victim (§ 288.7, subd. (b)).  These convictions were based on the photos discovered on appellant's cell phone in a clandestine app in which he was seen manipulating the Victim's vagina.  He used his finger in one picture and his thumb in another picture to open her vagina.[14]

At sentencing, the court noted the "egregious" nature of appellant's actions.  In general, it observed that all of appellant's crimes "were independent of each other" because they occurred on separate dates and occasions, and involved different types of misconduct.  With respect to counts 1 and 2, the court stated that these two offenses were committed on different occasions.[15]

In the present claim, appellant asserts that the trial court's reasoning for imposing these consecutive sentences was factually flawed.  He argues that the evidence shows that

---

[14]	Only a slight penetration of the labia majora is needed to establish a sexual penetration of a female victim.  (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1364.)

[15]	When imposing this sentence, the trial court misspoke regarding the exhibit number supporting the conviction in count 2.

his criminal conduct in counts 1 and 2 occurred during the same incident. In the alternative, he contends that his trial counsel was ineffective in failing to object to this sentence. Appellant requests that we remand this matter for resentencing so the trial court can reassess the issue of whether consecutive or concurrent sentences should be imposed in counts 1 and 2.

We reject appellant's arguments. This claim is forfeited and, in any event, it fails on its merits.

## A. This claim is forfeited.

Our Supreme Court holds that a defendant must object at sentencing regarding claims that the lower court failed to properly make or articulate its discretionary sentencing choices. Failure to raise those concerns below results in forfeiture. (*People v. Boyce* (2014) 59 Cal.4th 672, 730–731.)

It is undisputed that appellant did not object below regarding the imposition of consecutive sentences in counts 1 and 2. Consequently, we agree with respondent that appellant has forfeited this claim. In any event, we also reject this claim on its merits and appellant fails to demonstrate ineffective assistance of counsel.

## B. The trial court did not abuse its sentencing discretion.

Trial courts have the discretion to impose concurrent or consecutive sentences when confronted with multiple convictions. (§ 669, subd. (a); *People v. Woodworth* (2016) 245 Cal.App.4th 1473, 1479.) To establish sentencing error in this matter, appellant points to California Rules of Court, rule 4.425. In relevant part, this rule permits a sentencing court to impose a consecutive sentence if the crimes were committed "at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." (Cal. Rules of Court, rule 4.425(a)(3).) Appellant notes that the photographs showing his manipulation of the Victim's vagina were taken on the same day (September 30, 2016). He contends

that these photos were likely taken in the same photo shoot. Thus, he contends that these pictures were taken so closely in time and place as to indicate a single period of aberrant behavior. Moreover, he argues that these two pictures show a single criminal objective.

We disagree that the court abused its sentencing discretion. California Rules of Court, rule 4.425, which appellant cites, is only a guideline for a sentencing court, and it does not impose a rigid obligation. (*People v. Calderon* (1993) 20 Cal.App.4th 82, 86–87.) Moreover, only a single factor in aggravation is required to impose a consecutive term. (*People v. Osband* (1996) 13 Cal.4th 622, 728–729.)

Although these pictures were taken on the same day, it is impossible to determine from this record how much time passed from when appellant took the first photo until he took the second one. However, the record does demonstrate that some time did pass between the taking of both pictures. In the first picture, appellant used his finger to manipulate the Victim's vagina. In the second picture, appellant used his thumb to open her vagina. Thus, it is clear that appellant changed the position of his hand after he inappropriately touched her the first time, and he touched her again with a different digit. As such, the record amply supports the trial court's determination that these crimes occurred on different occasions.

It is apparent that appellant had an opportunity to reflect on his criminal behavior before he took each photo and touched the Victim in different ways. In addition, the crimes in counts 1 and 2 involved several other aggravating circumstances. The Victim was particularly vulnerable. Further, the manner in which appellant touched her, photographing the different times he manipulated her vagina, indicated that he had planned out his lewd behavior in advance. (See Cal. Rules of Court, rule 4.421(a)(3) & (8) [circumstances in aggravation].) Finally, the court noted the "egregious" conduct that appellant exhibited throughout all of his criminal acts. Appellant concedes that this finding in aggravation could also support a consecutive sentence. We agree. Except in

36.

certain limited exceptions, any circumstance in aggravation may be considered in deciding whether to impose a consecutive sentence. (Cal. Rules of Court, rule 4.425(b).)

Based on this entire record, the trial court had ample grounds to impose consecutive sentences in counts 1 and 2. We will not disturb the exercise of that discretion. (See *People v. Davis* (1995) 10 Cal.4th 463, 552 [affirming imposition of consecutive sentence].) As such, this claim fails. We also determine that ineffective assistance of counsel did not occur.

### C. Appellant fails to demonstrate ineffective assistance of counsel.

We agree with respondent that it is not reasonably probable a more favorable sentence would have been imposed even if appellant's trial counsel had objected. Prior to sentencing, the probation department had recommended consecutive indeterminate prison terms in counts 1 and 2. In addition, the prosecutor asserted that appellant should receive the maximum possible aggregate sentence, including consecutive sentences in counts 1 and 2. According to the prosecutor, appellant had used the Victim as a pawn in his life, and he had acted abhorrently as a father.

At sentencing, the trial court stated that appellant had acted egregiously with the Victim, and the court concluded that the crimes in counts 1 and 2 had occurred on different occasions. The court imposed the maximum possible sentence against appellant, imposing an upper determinate term of eight years in count 3 for committing a lewd act upon a child in violation of section 288, subdivision (a). Consequently, it is readily apparent that, even if defense counsel had objected, the court would have nevertheless imposed consecutive sentences in counts 1 and 2. As such, appellant's claim of ineffective assistance fails for lack of prejudice. (See *People v. Lucas*, *supra*, 12 Cal.4th at p. 436.) Our confidence in the outcome of this matter is not undermined. (*Ibid.*) Therefore, appellant's arguments are without merit and resentencing is not required.

**VIII.  We Vacate the Fine Imposed under Section 294, Subdivision (b).**

At sentencing, the trial court imposed a $1,000 restitution fine pursuant to section 294, subdivision (b).  The parties agree, as do we, that the imposition of this fine was in error.

Section 294 permits a restitution fine if a defendant commits certain enumerated crimes.  However, none of those enumerated crimes are applicable in this matter.  As such, we agree with the parties that this fine must be vacated.

## DISPOSITION

The judgment is modified as follows:

The subordinate determinate sentence imposed in count 10 is reduced from two years to eight months.  The fine imposed under section 294, subdivision (b), is vacated.  Any unpaid balance for the presentence probation report fee imposed under former section 1203.1b is vacated.  The trial court shall prepare an amended determinate abstract of judgment that reflects these modifications.  The court shall also reflect in the amended abstract that appellant was convicted in count 10 of violating section 311.4, subdivision (c).  The court shall forward the amended abstract of judgment to the appropriate authorities.  In all other respects and, as modified, we affirm the judgment.


LEVY, Acting P. J.

WE CONCUR:


FRANSON, J.


MEEHAN, J.

38.